The FIRST NATIONAL BANK OF CHICAGO, Appellant (Appellee and Cross-Appellant),

v.

JEFFERSON MORTGAGE COMPANY, Appellee (Appellee and Cross-Appellee),

v.

J. I. KISLAK MORTGAGE COMPANY, INC., Appellee (Appellant and Cross-Appellee).

Nos. 77–1040 and 77–1505 to 77–1507.

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1977.

Decided Mar. 31, 1978.

As Amended May 16, 1978.

John C. Lifland, Stryker, Tams & Dill, Newark, N. J., for appellant The First National Bank of Chicago.

Richard L. Plotkin, Pitney, Hardin & Kipp, Morristown, N. J., for third party defendant-appellee J. I. Kislak Mortgage Co., Inc.

Donald S. Ryan, Schantz, Tropp & Ryan, Haddonfield, N. J., for appellee Jefferson Mortgage Co.

Before ALDISERT and WEIS, Circuit Judges, and CHRISTENSEN, District Judge.*

## OPINION OF THE COURT

CHRISTENSEN, District Judge.

These consolidated appeals from the same diversity of citizenship case tried to the court involve an oral contract to sell mortgage-backed securities for $5,000,000. The case began rather simply.

The First National Bank of Chicago alleged in its complaint that through a mortgage broker, J. I. Kislak Mortgage Co., it entered into a contract by which it purchased from the defendant, Jefferson Mortgage Company certain 30 year mortgage-backed securities in the principal amount of $5,000,000 fully guaranteed as to payment of principal and interest by the Government National Mortgage Association, at a price of 96% of the principal amount, with delivery to be made in March, 1974; that thereafter it sent to defendant a letter confirming this contract of sale; that the market value of these securities had been increasing and that the securities at the time of filing the complaint on February 28, 1974, had a market value in excess of 100% of the principal amount; that on or about January 10, 1974, defendant denied the existence of the contract and repudiated its obligation and thereby breached the contract, and that plaintiff was ready, willing and able to perform its obligations by accepting the securities and paying the defendant the agreed price. A judgment for damages was sought against Jefferson Mortgage Company with interest and costs of suit.

An array of cross-fires and counter-attacks ensued: An answer was filed by the mortgage company denying the existence of any enforceable contract and asserting that the mortgage broker purporting to negotiate it was without authority to do so. A third party complaint for indemnity was interposed by the mortgage company against the broker in the event the mortgage company were called upon to respond in damages to the plaintiff. Another third party complaint for damages was intro-

* Honorable A. Sherman Christensen of the United States District Court for the District of Utah, sitting by designation.

duced by the plaintiff Bank against the broker in the event it was denied damages from the mortgage company. A counterclaim also was lodged by the broker for judgment over against the mortgage company if the broker were determined to be liable to plaintiff. A second counterclaim was filed by the broker against the mortgage company to recover commissions on the sale of the securities irrespective of whether its efforts resulted in an enforceable contract.

The district court held that the broker had no authority from the mortgage company to enter into the oral contract on its behalf with the Bank, and consequently that no contract enforceable against the mortgage company was created. But a judgment was entered in favor of the Bank against the mortgage broker for breach of its implied warranty of authority for the same amount of damages as the court deemed the Bank would have been entitled to as against the mortgage company had the broker been authorized to close the contract orally.

To permit better understanding of this welter of claims and developing issues involving the law of contracts, securities, agency, anticipatory breach, measure of damages, and damage evidence, a more detailed sorting out of the parties and the subject matter of the action seems desirable at this point.

The First National Bank of Chicago (the Bank), plaintiff in the district court, appellee in No. 77–1040, cross-appellant in Nos. 77–1505 and 77–1507, and cross-appellee in No. 77–1506, is a national banking association with its principal place of business in Chicago, Illinois. During the relevant period it was buying from Wall Street dealers or mortgage brokers selling on commission, the type of securities with which this case is concerned, both for its investment account and resale to others.

Jefferson Mortgage Company (Jefferson), defendant below, appellee in Nos. 77–1505, 1506 and 1507, is a New Jersey corporation with its principal place of business in Cherry Hill, New Jersey. It is a mortgage banking company which obtained mortgage applications from purchasers of residences through real estate brokers, processed those applications through the Federal Housing Authority or the Veterans Administration, made commitments to the buyers, borrowed money from supplier banks for closing and sold the mortgages to investors.

J. I. Kislak Mortgage Company (Kislak), was a third party defendant in the district court, on this appeal the appellant in No. 77–1040, a cross-appellant in No. 77–1506, and an appellee in Nos. 77–1505 and 77–1507. It is a New Jersey corporation with principal place of business in Newark. As one of the largest mortgage brokers in the State it among other activities contacted companies engaged in the origination of mortgages to determine if they had mortgages for sale, in what form those mortgages would be sold and the terms and conditions upon which they were willing to sell them, thereupon relaying the resulting offers for sale to institutional investors, such as the Bank involved in this litigation. It was well acquainted with the GNMA market and had frequently dealt with the Bank in this market.

Government National Mortgage Association (GNMA) is not a party to this litigation but the securities which its activities generated played a central role. It is a wholly-owned corporate instrumentality of the United States within the Department of Housing and Urban Development. It was authorized by the National Housing Act, 12 U.S.C.A. § 1717(a)(2)(A), *et seq.*, and 24 CFR Section 390.1, to guarantee timely payment of the principal of, and interest on, securities based on and backed by pools of mortgages insured by the Federal Housing Administration or guaranteed by the Veterans Administration.[1]

1. The mortgage pool would be formed by a mortgage company, such as Jefferson, which had originated or bought the necessary FHA and VA mortgages, closed the loans, and would place the mortgage documents in the custody of a supervised lender, usually a commercial bank. The custodian bank would certify to GNMA that it had physical possession of the

Both primary and secondary markets existed for GNMA (sometimes referred to as "Ginnie Mae") securities. The primary market involved sale by the issuer. Any transaction after the primary sale was considered to be in the secondary market. An "immediate sale" commonly called for delivery within thirty days. A "future sale" was considered to be any sale with a delivery date beyond thirty days. We are concerned in this case with a future sale of securities in the primary market.

A "full yield maintenance clause" was universally used in GNMA transactions with future delivery dates. The purpose of the clause was to assure the investor-purchaser upon delivery of the securities the same yield as had been contracted for despite any raising or lowering of FHA or VA interest rates in the meantime. Thus, also, would the issuer-seller be protected from default on the contract should FHA or VA rates change before delivery, through the option of delivering securities with an equivalent yield.

After a trial of several days and the submission by counsel of briefs and suggested findings, the district court filed a memorandum decision accompanied by painstakingly detailed supplementary findings of fact, with meticulous citations to the documentary and testimonial record. After careful consideration, we have concluded that all of these detailed findings, as distinguished from conclusions of law or mixed legal and evidential conclusions with reference to damages, are amply supported by substantial evidence. These ultimate issues at the outset recognized by the trial court as being sharply in dispute: whether or not Jefferson either authorized or ratified Kislak's action of making a contract by telephone, and therefore whether Jefferson or Kislak was responsible for the damages suffered by the Bank, and the amount of such damages. The trial court in its opinion then fairly summarized the facts central to the issue of liability in substance as follows:

The Bank's claim arose in a market whose customs were changing. At the time in question sales by mortgage bankers of whole loans had traditionally involved variables of which written documentation was ordinarily necessary, but the market in securities backed by mortgages had, not long before, shifted to the "securities way of dealing" by which contracts were made over the telephone.

In September, 1973, a representative of Kislak by the name of Brotman spoke to a representative of Jefferson by the name of Smith about the possibility of Jefferson's selling mortgage-backed GNMA bonds, through Kislak, the bonds to be issued in the future and sold before issuance on the futures market. The market for GNMA futures in September, 1973, was significantly higher than for whole loans. Neither Jefferson as an organization nor its representative as an individual possessed experience in the issuing or selling of GNMA bonds, and there was no explicit discussion between the representatives of Jefferson and Kislak about the proposed transaction's being made by telephone. The Jefferson representative made clear that he and his firm were unfamiliar with GNMA transactions, and would look to Kislak for guidance. However, when directed by Jefferson to "make a deal" at a given price, Kislak entered into a contract of sale with the Bank. The Bank promptly sent to Jef-

proper documentation for all loans in the pool and would forward a list of the loans to GNMA with other required forms. GNMA would approve the issue, assign a pool number and a series of certificate numbers, and prepare the certificates. The certificates could be issued in the name of the issuer or in a street name. The issuer, under contractual arrangement with GNMA, would be responsible for servicing and administering the mortgages forming the pool and would receive monthly remuneration for these functions.

ferson a letter in confirmation of that contract.[2]

This confirmation letter accurately reflected the agreement between Kislak, as it purportedly acted for Jefferson, and the Bank, including provision for a "full yield maintenance" clause which both Kislak and the Bank then understood was standard in GNMA sales. Finding unacceptable this clause by which the issuer of GNMA bonds would have to perform even if the maximum VA–FHA interest rates were to be changed before the future delivery date of the bonds, Jefferson did not acknowledge the Bank's letter. After various conversations and correspondence Jefferson not later than October 1, 1973, made it clear that it did not consider itself bound by the oral agreement made by Kislak and that it rejected the contract reflected in the Bank's letter.

In the face of sharply conflicting evidence which will be discussed hereafter, the trial court determined that when Kislak was directed by Jefferson to make a "deal" at the given price the latter contemplated only the solicitation of a commitment or firm offer to buy at the specified price subject to later acceptance of the proposed

---

2.

THE FIRST NATIONAL BANK OF CHICAGO

September 17, 1973

Jefferson Mortgage Company
1415 Route 70
East Cherry Hill Plaza
Cherry Hill, New Jersey 08034
Attn: Frank Smith, Vice President

Acting as Principal we are pleased to confirm our purchase from you of 30-YEAR MORTGAGE BACKED SECURITIES (Modified Pass-Through Type) To Be Fully Guaranteed as to Timely Payment of Principal and Interest by GOVERNMENT NATIONAL MORTGAGE ASSOCIATION, As Described Herein.

Accrued interest from issue date to settlement date as shown.

RE: GNMA Pool No. ____
Amount: $5,000,000

Interest Rate: 8%

Issuer: *

Issue Date: *

Settlement: March 1974

Price: 96

Subject to Issuance and Guarantee by Government National Mortgage Association.

Monthly payment of principal and interest on this issue of Mortgage backed securities will commence 45 days after issue date.

Before the securities are issued you will send your confirmation showing the final settlement date and the exact amount of principal and accrued interest due.

In the event that the FHA or VA Mortgage rate is changed during the term of this commitment, you may deliver GNMA securities bearing a corresponding change from the securities interest shown above. In this event you will deliver the new rate securities at a price which will produce the same yield as provided by this contract. (Yields to be calculated on the basis of prepayment in 12 years). Notwithstanding the above provision we will not pay more than a price of 100 percent of par for any securities delivered under this commitment.

Please acknowledge the foregoing by signing and returning one copy of this letter to the undersigned.

Sincerely,

The First National Bank of Chicago
By: Richard A. Wertz

_____

/s/ Richard A. Wertz

Acknowledged:

_____

By:

_____

Date:

* To be announced.

commitment in writing, that an oral contract had not been authorized by Jefferson and that such contract was not subsequently ratified. Accordingly, it was concluded by the trial court that Jefferson was not liable to the Bank, but that Kislak having breached its implied warranty of authority was. Judgment was entered against Kislak in the sum of $40,625, representing the difference between the market value of the securities at the times of contract and contracted delivery, which the court construed to be March 31, 1974.

In reaching its conclusions the district court held that the GNMA securities were investment securities within the contemplation of UCC 8–102(1)(a), NJSA 12A:8–102(1)(a).[3] Having so determined, it confronted Jefferson's contention that the contract relied upon by the Bank was barred by the securities statute of frauds. Questioning whether that statute was intended to be applied to transactions between a broker and his customer, the court nonetheless held that the Bank's letter of September 17, 1973, satisfied the statute of frauds, since it was written promptly, used words of confirmation, was received by the party against whom enforcement was sought, and was not objected to in writing within ten days.[4] Nor, said the court, despite its yield maintenance clause was the price indefinite within the contemplation of the statute.

Although questioned by one or the other of the parties, we find these conclusions unassailable, as we do the finding that following Jefferson's repudiation of the contract purportedly made on its behalf the Bank did not attempt to "cover" the securities by independent purchases on the market.[5] Had cover been effected, the problem of damages discussed at length hereafter would have been simplified, since as we shall see the cost of the actual replacement of the securities within a commercially reasonable time after repudiation could have measured the market for the purpose of computing damages. To avoid unduly prolonging this opinion, we shall not further discuss these rulings except as they may be touched upon in connection with our treatment of the following primary issues on this appeal:

I. Was there a binding oral contract entered into between Jefferson and the Bank

---

3. (1) In this Chapter unless the context otherwise requires

    (a) A "security" is an instrument which
    (i) is issued in bearer or registered form; and
    (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
    . . . .
    Hereafter references to sections of the Uniform Commercial Code usually will be made without parallel citations to its enactment as Title 12A, New Jersey Statutes Annotated (NJSA).

4. A contract for the sale of securities is not enforceable by way of action or defense unless
    . . . .
    (c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; [Paragraph (a) requires the writing include "a stated quantity of described securities at a defined or stated price."]
    § 8–319 UCC.

5. The Court finds unpersuasive the evidence that the Bank made a cover purchase on October 5, 1973. No documents indicate that a cover was made. In fact, the ledger sheets reflect that the Kislak-Jefferson purchase was carried on them until a date in November, 1973. The Bank's GNMA trader never mentioned the cover purchase to Kislak, despite frequent telephone conversations; nor did the Bank advise Jefferson that it had covered even at the October 21, 1973, meeting, following the date of the alleged cover. Significantly, the Bank's legal department made no mention of a cover in its December 14, 1973 letter to Jefferson, but instead threatened litigation to seek recovery of damages "which the Bank may incur if it is obliged to purchase GNMA-backed securities" in replacement of the ones in issue; and the Bank's GNMA trader, although aware of this letter, made no attempt to advise the legal department that the letter was incorrect in indicating that no cover had yet been made. In view of all these facts, the Court declines to credit a recollection that a cover purchase was made at a time when the market was near its highest point for the period September 17, 1973, through March 31, 1974.
Memorandum Decision, District Court.

through Kislak as a result of the telephone conversations of September 17, 1973?

II. Did the trial court apply the correct legal principles of agency when it held Kislak liable to the Bank for breach of an implied warranty of authority and was that ruling warranted by the pleadings and the theories relied upon by the Bank at the trial?

III. Did the trial court apply the correct measure of damages to Kislak's liability and, if not, what was the proper measure under New Jersey law for the anticipatory repudiation of a contract for the sale of securities?

IV. Was Kislak entitled to a commission for representing Jefferson even though it may have exceeded its authority in attempting to bind Jefferson by an oral agreement?

V. Did the trial court properly receive in evidence the weekly trade publication "The Mortgage Backed Securities Reports" for the limited purpose of showing trends of market prices rather than for the purpose of quantifying those prices?

## I

We begin, then, with the proposition that as far as the Bank was concerned, a contract had been entered into by it with Jefferson for the purchase of the securities in question. Having dealt with Kislak before on a similar basis, and having common understanding of the practice, it proceeded in good faith to orally close a contract, including the yield maintenance clause usual in the GNMA market. The terms of the transaction as understood between the Bank and Kislak were reflected in the confirmation letter signed by an officer of the Bank and sent to Jefferson under date of September 17, 1973.

The trial court held that Kislak acted in excess of its authority by entering into the oral contract with the Bank on Jefferson's behalf. Kislak contends that it had express authority or implied authority within the usage of the market to so act and, in any event, that Jefferson ratified the oral contract.

Section 36 of the *Restatement of Agency* provides:

"Unless otherwise agreed, an agent is authorized to comply with relevant usages of business if the principal has notice that usages of such a nature may exist." "In order to bind the principal, however, the usage or custom must be one which does not change the intrinsic nature of the agent's authority by enlarging his powers. It may only be used to establish and determine the extent of the powers actually given." 3 Am.Jur.2d, Agency § 72, p. 474. *See also Public Service Mut. Ins. Co. v. White,* 4 N.J.Super. 523, 68 A.2d 278 (1949).

The court found in effect that neither Smith nor his employer Jefferson independently had notice that the usage now relied upon by Kislak may have existed. Kislak, as the court determined, "acted as a broker on behalf of Jefferson and agreed to attempt to find a buyer . . . for a commission of one-half of one percent if a sale was made through it." The recognition of the custom in the context of the court's other findings would have changed the intrinsic nature of Kislak's authority by enlarging his powers. There was no other understanding expressed between the parties which would have supplied justification. It is significant that the district court found that the GNMA market customs were in the process of changing and that Jefferson relied on Kislak for guidance in the market. Whereas formerly written documentation ordinarily was necessary to close even GNMA transactions, the market had recently shifted to the "securities ways of dealing" by which contracts were closed over the telephone. Kislak was aware of this shift, but Jefferson was not, as the court also found. And the court found specifically upon an adequate record that "[t]here was no discussion [between Smith and Brotman] about a telephone call being binding with respect to a sale of GNMAs."

Brotman's testimony to the contrary was given no credence by the trial court, and this rendered his related statement all the more significant:

Q. Why did you think it was so important to tell him?

A. Because I was aware, as a result of other transactions that had occurred in the GNMA market in the past, that because of a difference in the common way Wall Street deals and the common way mortgage bankers have dealt prior to 1971, when GNMA's became common, that it was important to tell a mortgage company that the GNMA transaction is verbal and that he should be aware of that before he expressed a willingness to firm up the deal on the phone.

As indications that there was an agreement for the finalization of a contract over the telephone, Kislak points to Smith's repeated insistence upon a written acknowledgment by both the Bank and itself that the transaction would be conditioned upon Jefferson's subsequent authorization as an issuer of GNMAs, his use of or acquiescence in the term "we have a deal" in telephone conversations, reference by Smith in a letter to Brotman on September 18 to a "commitment" subject only to the written statement of the contingency of Jefferson's authorization of authority as issuer, and the fact that Jefferson's first communicated ob-

jection to the inclusion of the full yield maintenance clause in the purported written confirmation was not made until October 21, 1973. If Brotman's testimony were to be interpreted most favorably to Kislak's position such arguments would carry considerable weight.

But these circumstances also were susceptible of the construction placed upon them by the trial court as consistent with the absence of any authority in Kislak to close a contract orally on behalf of Jefferson. References to a "deal" in telephone conversations between Brotman and Smith reasonably can be interpreted in harmony with the trial court's findings in the context of Kislak's commission arrangement for obtaining a buyer at the price specified by Smith, still contingent upon the issuer authorization. Some of Brotman's testimony,[6] as well as Smith's letter of September 18 to Kislak commingle references to the commission commitment and a written commitment from the Bank with reference to the sale of the securities.[7] The trial court, as already noted, found that the inclusion of the full yield maintenance clause in the Bank's letter was in the nature of an un-

---

**6.** Brotman testified with reference to the conversation with Smith among other things:

. . . He [after checking with his board of directors] said that 96 would be acceptable. I then went over the terms again, the price of 96, 95 and a half net to him, because of the one-half point commission, and that the commission would be payable—originally I said when the deal is confirmed, and he reminded me about the idea of being approved as an issuer. And I said, "Okay, we will make a commission payable on approval by GNMA." And delivery was to be March. It would be a five million of 8 percent certificates, and again I said, "I am going to make that call, and that is going to be the deal. . . ."

**7.** Kislak wrote to Smith on September 17, 1973, not with specific reference to any completed transaction with the Bank, but primarily concerning Kislak's commission agreement:

At your request, we have offered to the First National Bank of Chicago $5,000,000 in 8% GNMA certificates collateralized by 8½% VA & FHA loans.

We have offered these loans to them at a price of 96. Delivery will be by March.

This is to confirm our understanding that our commission will be ½ of 1%. I will be in touch with you. . . .

Smith's September 18 letter was in response to this communication concerning the "offer" and the "commission". While Smith did refer to withdrawal from "this commitment" (which Kislak now interprets as to commitment to the Bank) if Jefferson were not approved as a GNMA issuer, this also could be interpreted as referring to a withdrawal from the commission agreement on the same contingency. The letter does refer specifically to a written commitment expected from the Bank in the following paragraph:

Apparently Mr. Brotman has conveyed this information to First National Bank of Chicago, and they will include in this commitment letter to us the fact that failure to obtain our approval will void the commitment. Further, Mr. Brotman also acknowledged that your Commission is due when we obtain our GNMA approval from Washington.

It will be recalled in this connection that the Bank's "confirmation" letter was presented in the form of a written commitment, with a place indicated for the written approval of Jefferson. See n. 2, *supra*.

pleasant surprise to Smith. While any communicated objection to the sale on this ground was delayed, there was no waiver of the objection either, merged as it was with Jefferson's refusal to sign the general acceptance form tendered by the Bank. We are not impressed with Brotman's excuse for not pointedly explaining to Smith that any sale had to involve a yield maintenance clause. The fact that Smith had told Brotman that Jefferson had enough mortgages "in the pipeline" to satisfy the sale could not bind Jefferson to the acceptance of such a clause, authority or no authority to orally contract, if as the trial court found neither Smith nor Jefferson was told or knew about the necessity of such a provision in GNMA transactions.

■ Whether parties become bound by oral agreements or only upon execution of writings is a question largely dependent upon intention. Judging of credibility is peculiarly vital in connection with questions of intent. The district court determined in view of all the circumstances of the case that there was no such intention and that Jefferson had not granted authority for Kislak's orally binding it by contract with the Bank. There is substantial evidence in the record to support those determinations. Resting as they did primarily upon the question of witness credibility and inferences drawn from documentary evidence in the light of the testimony, the clearly erroneous rule applies in full force. Rule 52(a) F.R. Civ.P. On the entire evidence we are not left with a definite and firm conviction that a mistake was made. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *U. S. v. U. S. Gypsum Co.,* 333 U.S. 364, 68 S.Ct.

525, 92 L.Ed. 746 (1948); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394 (3d Cir. 1976); *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir. 1972). The evidence is by no means one-sided. Yet, on close questions of fact the force of the clearly erroneous rule continues unabated; indeed, as to these the rule has special justification, for the preferred position of the trial court to evaluate the evidence firsthand and in context affords special weight to judgment in even delicate balance.

■ The trial court held that Jefferson repudiated the unauthorized oral contract within a reasonable time after its receipt of the Bank's September 17, 1973, letter and in effect that there were no intervening circumstances constituting ratification. We already have commented sufficiently upon the circumstances to indicate the basis of our judgment that the trial court's findings in this respect also are entitled to be sustained as being not clearly erroneous.

## II

Nor did the district court err in holding Kislak liable to the Bank on the theory of its breach of an implied warranty of authority.

Kislak contends that "the Bank at no time filed a direct claim against Kislak for breach of implied warranty of authority, no motion to amend the Bank's pleadings was made, and the issue was not tried by the express or implied consent of the parties." However, we believe that the Bank's pleadings gave Kislak fair notice of this claim.[8] It was implicit in the development of the issues at the trial[9] and was recognized and

---

**8.** The Bank filed a third-party complaint against J. I. Kislak Mortgage Co. as follows:

> If it is determined that third-party defendant, J. I. Kislak Mortgage Co., Inc. (Kislak) defendant's authorized agent, did not represent the terms of the contract in accordance with Kislak's authorization from defendant and that defendant is therefore not bound, then Kislak's misrepresentations as to its authority to act as agent for the defendant, upon which plaintiff reasonably relied, resulted in damages to plaintiff in the sum of

$238,750. Wherefore plaintiff demands judgment against Kislak in the amount of $238,750, together with interest and costs of suit.

**9.** Appropriate answers placed the respective complaints and third-party complaints at issue. In connection with Kislak's answer to third-party complaint, Kislak filed counterclaims in which it is alleged that "if plaintiff succeeds in proving the allegations of its claims it will be established that Kislak held itself out as at all times an agent and that any wrongful acts were those of Jefferson as its principal and that in

responded to by Kislak in the proceedings below.[10] We reject Kislak's attempt in the context of this case now to restrict the term "misrepresentation of authority" to situations involving all of the elements of common law deceit. If there could be thought any technical insufficiency of the pleadings, they may be deemed to have been amended to conform to the proof authorizing the findings of the court. Rule 15(b) F.R.Civ.P.

The attack on the merits against the related findings and conclusions of the trial court also fail. *Rainier v. Champion Container Company,* 294 F.2d 96 (3d Cir. 1961); *University Marketing and Consulting, Inc. v. Hartford Life and Accident Insurance Company,* 413 F.Supp. 1250 (E.D.Pa.1976); *Weinberg and Bush, Inc. v. Murray,* 188 F.Supp. 263 (D.C.D.C.1960), *aff'd,* 110 U.S. App.D.C. 319, 293 F.2d 158 (1961); Restatement (Second) of Agency § 329 (1957). Cf. *Hoesch Handel AG v. Goldfarb,* 527 F.2d 1099, *petition for reh. den.,* 531 F.2d 820 (6th Cir. 1976). The proof did not invoke any possible exception to the general rule, such as the insolvency of the principal or other obstacle to enforceability against Jefferson had authority on the part of the agent existed.

■ In our opinion the district court validly concluded on the basis of supportable findings that Kislak breached an implied warranty of authority and that it was liable to the Bank for damages proximately resulting from that breach.

### III

As to the amount of damages against Kislak the trial court said:

Damages against a broker might not always be the same as damages against a non-performing seller, but in this case they are. At any rate the Article Two measure of damages as interpreted by the Court is, as applied to this case, the same as the common law measure.

While we believe that, indeed, in this case the measure of the Bank's damages against Kislak should be the same as that which would be applied to recovery against a nonperforming seller in the event of the breach of an authorized contract, we have concluded that the court erred in holding that these should be computed on the basis of the difference between the contract price of the securities and their market value as of the time of the contracted performance—March 31, 1974.

As ruled by the trial court, GNMA securities are investment securities within the meaning of Article 8 of the Code. NJSA 12A:8–102; *Lehman Government Securities, Inc. v. Commercial Mortgage Co.,* 16 UCC Rep. 1117 (NY Sup.Ct. 1975). Article 8 provides for a seller's remedies against a buyer, NJSA 12A:8–107, but it does not contain a parallel section for a buyer's remedies against a seller for breach of a contract to purchase securities. NJSA 12A:2–105 expressly excludes investment securities from Article 2 coverage. However, the official comment to Section 2–105 states:

"Investment securities" are expressly excluded from the coverage of this Article. It is not intended by this exclusion, however, to prevent the application of a particular section of this Article by analogy to securities when the reason of that section makes such application sensible and the situation involved is not covered by the Article of this Act dealing specifically with such securities (Article 8). (Citation omitted.)

*Bache & Co., Inc. v. International Controls Corp.,* 339 F.Supp. 341 (S.D.N.Y.1972), *aff'd*

---

the event that plaintiff succeeds in obtaining a judgment against third-party defendant Kislak, said third-party defendant is entitled to judgment over against defendant-third-party plaintiff Jefferson since Kislak acted within the scope of its authority as agent for Jefferson."

**10.** Kislak's post-trial memorandum in the district court in response to the Bank's brief con-

cerning Kislak's claimed liability to the Bank stated:

This brief on behalf of Kislak shall respond to the direct claim filed against it by plaintiff on the tort of misrepresentation (even though the claim was abandoned by the Bank) and shall also respond to the claim contained in plaintiff's brief on the issue of breach of implied warranty of authority.

*on opinion below,* 409 F.2d 694 (2d Cir. 1972); *Morris v. Kaiser,* 292 Ala. 650, 299 So.2d 252 (1974); *Colt v. Fradkin,* 361 Mass. 447, 281 N.E.2d 213 (1972); *Mortimer B. Burnside & Co., Inc. v. Havener Securities Corp.,* 25 A.D.2d 373, 269 N.Y.S.2d 724 (1966). *But see In Re Carter's Claim,* 390 Pa. 365, 134 A.2d 908 (1957); *Lineberger v. Welsch,* 290 A.2d 847 (Del.Ch.1972).

Kislak argues that the UCC covers only liabilities between buyers and sellers, and should not be applied to determine a buyer's remedy against a broker, citing *Hutton v. Zaferson,* 509 S.W.2d 950 (Tex.Civ.App. 1974); *Reinhart v. Rauscher Pierce Securities Corp.,* 83 N.M. 194, 490 P.2d 240 (Ct. App.1971); *Lindsey v. Stein Brothers & Boyce, Inc.,* 222 Tenn. 149, 433 S.W.2d 669 (1968), and *Stott v. Greengos,* 95 N.J.Super. 96, 230 A.2d 154 (App.Div.1967). However, these cases involved situations where a customer had entered into an agency contract with a broker and a subsequent suit was brought on that contract. It was held in each instance that the Statute of Frauds found in Article 8 of the Code did not apply to a transaction where a customer authorized his broker to purchase or sell stock for him on a commission basis, because this was not a contract for the sale of securities but rather a contract of agency. In the instant case, the Bank's claim against Kislak is based upon a sales contract and only tangentially involves an agency relationship with another party.

■■■ For a breach of implied warranty of authority an injured party may recover for the loss or harm caused, including the amount by which the party would have benefited had the broker's authority in fact existed. Restatement (Second) of Agency, § 329 comment (j) at 85 (1957). What the Bank lost by reason of Kislak's breach of its warranty of authority was the right to recover damages against Jefferson, the principal, for breach of contract. Consequently, the amount that the Bank could have recovered against Jefferson had Kislak in fact been authorized measures the damages recoverable against Kislak. It is logical to apply Article 2 by analogy to determine the damages due to the Bank from Kislak for a breach of implied warranty of authority.

The district court found that Jefferson unequivocally repudiated the contract on October 1, 1973, long before the date set for performance. UCC Section 2–610 provides that upon anticipatory repudiation, an aggrieved party may "(a) for a commercially reasonable time await performance by the repudiating party; or (b) resort to any remedy for breach (12A:2–703 or 12A:2–711) . . . (c) in either case suspend his own performance . . . ." According to 2–711, when a seller repudiates, a buyer may "cover" under 2–712 or may recover damages under 2–713. The district court held that the Bank did not "cover", and therefore 2–713 measures the damages the Bank may recover.

Section 2–713 (NJSA 12A:713) provides: *Buyer's Damages for Non-Delivery or Repudiation.*

(1) Subject to the provisions of this Chapter with respect to proof of market price (12A:2–723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Chapter (12A:2–715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

The most obvious interpretation of the phrase "learned of the breach" appears to be "learned of the repudiation." This much White and Summers, Uniform Commercial Code (1972), §§ 6–7 at 198 concedes. However, the district court interpreted the phrase "at the time when the buyer learned of the breach" to mean at the time of performance in reliance upon the contrary conclusions of the same treatise §§ 6–7, pp. 196–206. *See also, Cargill v. Stafford,* 553 F.2d 1222 (10th Cir. 1977). We find the New Jersey Study Comment to be a more

persuasive authority on the meaning of Section 2–713 as enacted by the New Jersey legislature.[11] The Comment adopts the view that the date of anticipatory repudiation is the "time when the buyer learned of the breach":

. . . the buyer may elect to recover damages for non-delivery, including repudiation, based on the difference between the price current at the time the buyer learned of the breach and the contract price together with consequential damages, but less any expense saved as a result of the seller's breach. This is the meaning of Section 2–713. This changes the rule of the Uniform Sales Act that the buyer's damages for non-delivery are the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered.

Because an aggrieved buyer is permitted to cover at any time after the breach and recover as damages from the seller the difference between the cost of cover and the contract price, it would be inconsistent to make a non-covering buyer compute his damages by reference to the time of performance instead of the time of breach. Such a rule would force a buyer to speculate on the wisdom of covering, and such speculation should not be encouraged by positive law.

We note that the New Jersey Study Comment supports the plain meaning of Section 2–713. The New Jersey Study Comments were distributed throughout the State of New Jersey prior to the enactment of the Code and were before the New Jersey legislature at the time the Code was adopted. See Abrams, "Introduction and New Jersey History of the Uniform Commercial Code", 17 Rutgers L.Rev. 1–4 (1962). The New Jersey courts have in fact relied on the New Jersey Study Comments and the Official Comments in interpreting the Code.[12] In the *Matter of Callahan Motors, Inc.,* 538 F.2d 76, 79 footnote 12 (3d Cir. 1976); *Southern Jersey Airways, Inc. v. Nat'l Bank of Secaucus,* 108 N.J.Super. 369, 261 A.2d 399 (App.Div.1970); *A. J. Armstrong Co., Inc. v. Janburt Embroidery Corp.,* 97 N.J. Super. 246, 234 A.2d 737 (Law Div. 1967).

Kislak argues that the word "breach" should not be interpreted to include a "repudiation" that technically a breach does not occur until the time for performance has arrived, and further, that if the drafters had intended to include repudiation the word would have been expressly used. However, it is clear from a careful reading of Section 2–711, that the word "breach" as used in the Code is not a narrow term pertaining to only one time period, but rather is a general one that can apply to a number of situations. See Leibson, Anticipatory Repudiation and Buyer's Damages—A Look Into How the UCC Has Changed the Common Law, 7 UCC L.J. 272, 277 (1975). Section 2–711 reads in part:

(1) Where the seller fails to make delivery or *repudiates* or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the *breach* goes to the whole contract . . . the buyer may cancel . .." (Emphasis added.)

It is apparent that the word "breach" in Section 2–711 refers to any of four contingencies, one of which is repudiation.[13]

11. The district court opinion cited the New Jersey Comments as contrary to the view taken, but no attempt was made to evaluate their significance as an indication of local law.

12. The Official Comment to Section 2–713 appears to be in accord with the New Jersey Study Comments; it begins: "The general baseline adopted in this section uses as a yardstick the market in which the buyer would have obtained cover had he sought that relief."

13. Kislak further argues that an interpretation of breach as used in 2–713 to include repudiation renders 2–723 meaningless. Section 2–713 provides for a buyer's remedies in the event of the seller's breach. Section 2–723 applies to both buyers and sellers and provides in part:

(1) If an action based on anticipatory repudiation comes to trial before the time for performance with respect to some or all of the goods, any damages based on market price (12A:2–708 or 12A:2–713) shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation.

Our interpretation of Section 2–713 is further supported by the policy expressed in Section 2–610. Under the latter section an aggrieved party is not entitled to await performance by the repudiating party indefinitely or until the performance date, but may await performance "for a commercially reasonable time only." The Official Comment to this section elaborates: "[If an aggrieved party] awaits performance beyond a commercially reasonable time he cannot recover resulting damages which he should have avoided." It would be illogical to allow an aggrieved party to await performance for only a commercially reasonable time and to limit damages as of that point under Section 2–610, and then allow a recovery of damages computed as of the performance date under Section 2–713.

These two sections of the Code should be interpreted in a consistent manner. Since under Section 2–610, an aggrieved party may for a commercially reasonable time await performance, Section 2–713 should be interpreted to measure damages within a commercially reasonable time after learning of the repudiation.

■ We are mindful that the views of the experienced trial judge on the subject of uncertain local law in the district within which he sits are entitled to special respect. Were it not for our firm conviction that an error has been made as to the measure of damages we would feel bound to accept them. See *Sta-Rite Industries, Inc. v. Johnson,* 453 F.2d 1192 (10th Cir. 1971), *cert. denied,* 406 U.S. 958, 92 S.Ct. 2062, 32 L.Ed.2d 344 (1972). Entertaining such a firm opinion for the reasons indicated, however, we find it necessary to reverse as to the interpretation of Section 2–713 and to

hold that within the contemplation of the New Jersey statute in question the expression "at the time the buyer learned of the breach" means "at the time the buyer learned of the repudiation".

Jefferson unequivocally repudiated on October 1. The Bank claims that a commercially reasonable time after Jefferson's repudiation ended on October 5, when Wertz, the Bank employee who dealt in GNMA securities, returned to his office after completing various prearranged business meetings in New Jersey and New York. We are not persuaded that "a commercially reasonable time" should be determined on the basis of the availability of any particular Bank employee. On the contrary, the very failure of the Bank otherwise to define and support by proof any commercially reasonable time beyond October 1 lends weight to the appropriateness of the latter date as a cut-off.

■ Ordinarily the circumstances of the particular market involved should determine the duration of a "commercially reasonable time." The district court found that GNMA securities in the fall of 1973 were treated like stock. Several Wall Street firms had established themselves as dealers in GNMA securities and were actively trading them. Thus, comparable GNMA securities likely were available for immediate purchase. Furthermore, at the time of the transactions in dispute, the price for GNMA securities was rapidly rising.[14] We have concluded that the record is insufficient to permit a finding that it was commercially reasonable for the Bank to await performance until October 5 or for any substantial time beyond October 1 for the purposes of quantifying damages.[15]

---

Our conclusion as to the proper interpretation of Section 2–713 does reveal Section 2–723 to be somewhat duplicative. This fact, however, does not outweigh the persuasion of the New Jersey Study Comments and the plain meaning of Section 2–713.

14. The district court found: " . . . from mid-August 1973 through mid-September 1973 there was a sharp, steady increase in the price of GNMA securities." Exhibit P reveals that this trend continued through December.

15. Modifying its statement of position only insofar as our rejection of its argument that the absence of an officer extended the commercially reasonable period, the Bank's brief, pp. 42–43 substantially concedes this:

Given these undisputed facts, *i. e.,* that Jefferson's October 1 repudiation was absolutely unequivocal, and that there was a well-organized and easily accessible market in GNMA securities available when Wertz returned to the Bank on October 5, [the record

In *Oloffson v. Coomer,* 11 Ill.App.3d 918, 296 N.E.2d 871, Coomer, a corn farmer, during April of 1970, agreed to sell 40,000 bushels of corn to Oloffson. One lot was to be delivered in October at a price of $1.1275 per bushel, and a second in December at $1.1225. On June 3, Coomer informed Oloffson that he would not be planting corn because the season had been too wet and told him to arrange to buy from someone else. On June 3, the price of corn for future delivery was $1.16 per bushel. Oloffson, however, continued to request performance. After the October and December delivery dates passed, Oloffson covered by purchasing corn at $1.35 and $1.49 per bushel. The court held that Oloffson's damage should be limited to the June 3 price, the date on which he learned of the repudiation. Furthermore, the court held that the commercially reasonable time period within which to await performance ended as of June 3, stating:

> Since Coomer's statement to Oloffson on June 3, 1970, was unequivocal and since "cover" easily and immediately was available to Oloffson in the well-organized and easily accessible market . . it would be unreasonable for Oloffson on June 3, 1970, to have awaited Coomer's performance rather than to have proceeded under Section 2–610(b) and, thereunder, to elect then to treat the repudiation as a breach.

shows that the same could be said of October 1] the conclusion that the "commercially reasonable time" under Section 2–610(a) included, as a matter of law, the period from October 1 to October 5, 1973 is mandated. In this respect, this case is virtually on all fours with *Oloffson v. Coomer, supra.* In *Oloffson . .* the court concluded that since the seller there had clearly repudiated on June 3, and since "cover" was easily and immediately available to the buyer in the "well-organized and easily accessible market for purchases of grain to be delivered in the future," the "commercially reasonable time" under Section 2 -610(a) expired as a matter of law on June 3. . . . The only distinguishing feature between this case and *Oloffson* is the fact that although there apparently had been no showing in *Oloffson* that the buyer there could not have immediately gone into the

So here. Because of the circumstances in the GNMA securities market at the time of the anticipatory repudiation, a commercially reasonable time for the Bank to await performance was not shown to have extended substantially beyond the date of repudiation. The Bank had fair opportunity to develop its proof in this respect. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 891, 894 (3d Cir. 1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). Therefore the Bank's damages should be computed upon the basis of the difference between the contract price and the market price on October 1, 1973.

## IV

Had there been a valid contract entered into by Jefferson and the Bank through Kislak's intervention there would be no question of the entitlement of the latter to its agreed commission. Kislak in effect contends that in any event, since it had at least an oral "deal" with Jefferson for the sale which the Bank was willing to consummate as a writing but which Jefferson rejected, the commission had been earned.[16] It is Jefferson's contention that construing together the circumstances and documents relating to the commission agreement, the unauthorized condition which the contract tendered by the Bank included, and the breach of Kislak's fiduciary duty of good faith disclosure, no commission was earned. We agree in view of

market and made "cover" purchases, the district court here made findings that Wertz was the only employee of the Bank who was involved in purchasing GNMA securities on behalf of the Bank, and that Wertz, having been tied up on October 2 and 3 in pre-arranged meetings in New Jersey and New York with representatives of Kislak and other sellers like Jefferson who failed to confirm contracts to sell GNMA securities to the Bank, had been unable to return to the Bank and have access to the market available for cover until October 5, 1973.

16. The trial court found that "Kislak acted as a broker on behalf of Jefferson and agreed to attempt to find a buyer for the GNMA security Jefferson wished to sell in exchange for a commission of one and a half of one percent if a sale was made through it."

the trial court's related findings. *See Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 236 A.2d 843 (1967); *DeHart v. DeHart,* 70 N.J.Eq. 774, 67 A. 1074 (E & A 1906).

## V

If the trial court had been correct in computing the Bank's damages, the admissibility limitation it placed upon Exhibit P. 27A, depicting graphs from Mortgaged Backed Securities Reports,[17] would have been moot, the Bank's reliance upon these being mainly for the purpose of establishing October, 1973, values. The significance of the October 1 value being evident from what we have already said, it becomes necessary now to discuss the ruling concerning the admissibility of this exhibit. The nature of the offer, objections and ruling are indicated in the margin.[18]

Consistent with the limitations imposed upon Exhibit P–27, and disregarding other general testimony on the state of the market during early October, the court initially found that "[t]here is no evidence in the record which indicates what the market price was on October 1 or on October 5, 1973, for 8% GNMA securities, with a March delivery date, in either the primary market or the secondary market." It later amended this finding to read that: "There is no conclusive evidence in the record which indicates with precision" what those market prices were. The purpose of this change is somewhat obscure on the record. If the object were to justify acceptance of the common law rule for computing damages as of the time of performance on the basis of the absence of "conclusive" evidence of value at the time of the anticipatory repudiation, recognition of the weakness of other grounds for the application of the common law rule might be implied, as well as a misconception of the burden of proof of a party claiming damages.

■ While the fact of damage must be established with reasonable certainty, the precise amount need not be shown with mathematical precision so long as the court

17. The record indicates no more than this is a trade publication which is published on a weekly basis and is circulated in the investment community. P. 27A covers the bid prices for GNMA securities bearing 8%, 7½%, 7% and 6½% for the period Jan. 1, 1973 to about December 10, 1973. P. 27B covers for the same securities for the period Jan. 1, 1974 to about Mar. 25, 1974.

18. Counsel for the Bank: Could you identify for us P27A and B?

A. (Wertz of the Bank): Yes, these are graphs that represent the bid prices on mortgage-backed securities which were published by the Mortgage-Backed Securities Report as part of their—you know, reports they send out, I believe, on a weekly basis.

Q. Is that a trade publication?

A. Yes it is.

. . . . .

[Objection to offer.]

Counsel for Kislak: In any event I have no objection for this document to go into evidence to show the various degrees of the incline and decline, but I do object if it is being introduced into evidence to permit the court to obtain a price of a security on any particular day.

THE COURT: No, there is some testimony here that there had been decline and inclines—if you can call it that—over a period.

. . . .

Counsel for Bank: Your Honor, I do want the record to have something in it which will allow you to conclude what the price was on any particular day and Mr. Ryan has no objection to that, and Mr. Plotkin does. Under those circumstances—depending upon your Honor's ruling—I would have to question Mr. Wertz further to establish that it accurately represents the prices, with a certain investment on any particular day depicted in that graph. I think Your Honor may need to know the price on any particular day. I do think the record should have that, depending upon the measure of damages your Honor chooses as legally appropriate in the event you find for the plaintiff.

Counsel for Jefferson: Objected, if the exhibit is offered for the purpose of a particular market price.

. . . . . .

Counsel for Kislak: Judge, the testimony has been that a quarter of a point, or a half of a point, is a substantial amount of money. And certainly from that graph one cannot testify with any degree of certainty, within a variance of one or two points, I would say, what the price was on that date, if, in fact, the graph were proper.

THE COURT: Well, it may be marked merely for the purpose of assisting the court, to show the ups and downs of the market at about the time that we have in question.

can arrive at an intelligent estimate without speculation or conjecture. *American Air Filter Co., Inc. v. McNichol*, 527 F.2d 1297 (3d Cir. 1975); *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 891 (3d Cir. 1975), *supra; Tessmar v. Grosner*, 23 N.J. 193, 128 A.2d 467 (1957).

It is true that foundations laid for the offer of P. 27A for any purpose were rather weak.[19] Yet the court accepted them as qualifying the exhibit for the purpose of showing trends. That it did not show with exactness the prices on the basis of which these trends were represented did not necessarily preclude its consideration for whatever light it could throw for the purpose of quantification. Any uncertainties precluding a precise indication of pricing could have been resolved against the offeror in arriving at the amount established by an intelligent and fair estimate without speculation or conjecture.

We have considered whether the state of the record was sufficiently undisputed as to permit our own determination of the market price of the securities in question as of October 1, 1973, in avoidance of the necessity of remand. We believe that the trial court could have made such a determination on the existing record. However, since it did not come to grips with this issue as essential to its basic ruling and, to the extent that it touched upon it, applied an overly demanding burden of proof, we have concluded that it would be more appropriate for the determination of the October 1, 1973, value to be made by the district court in the first instance, for which purpose the record may be supplemented upon the motion of a party or upon the court's own motion. Cf. *Rochez Brothers, Inc. v. Rhoades, supra*, 527 F.2d at 894–95.

Other points and counterpoints pressed by the parties do not warrant discussion beyond what already has been said in connection with main issues already addressed.

For the reasons stated, the judgment of the district court will be reversed as to the measure and amount of damages, and the case remanded for further consideration of the amount of damages in harmony with the views herein expressed. In all other respects the judgment will be affirmed.

---

**19.** The Bank cites N.J.S. 12A:2–724 applied by analogy to actions for breach of contract for the sale of securities, Rule 803(17) of Federal Rules of Evidence, *Virginia v. West Virginia,* 238 U.S. 202, 212, 35 S.Ct. 795, 59 L.Ed. 1272 (1915), and other cases demonstrating that market reports "published as the reports of such market", "generally used and relied upon by the public", or by the public "accepted as trustworthy" are admissible to establish values. Accepting the statements of admissibility as therein laid down, it is to be observed that essential foundations for the applicability of the rules were not clearly developed by the Bank, despite the indication of its counsel that this would be done. Upon remand it is to be assumed that essential foundations covering the nature and public or market acceptance of the publication for the purpose of quantification of market prices at particular times in accordance with the published graphs will be offered should reliance beyond the showing of market trends be then intended.