**HAMS EXPRESS, INC.**

v.

**JOSEPH LAND & CO., INC.**

Civ. A. No. 79–0203.

United States District Court,
E. D. Pennsylvania.

Oct. 7, 1980.

Charles W. Boohar, Philadelphia, Pa., for plaintiff.

Martin J. Cunningham, Jr., Norristown, Pa., for defendant.

## MEMORANDUM AND ORDER

GILES, District Judge.

This action arose out of a series of five contracts for the carriage of perishable freight by plaintiff, Hams Express, Inc. (hereinafter "Hams") an interstate trucking company and defendant, Joseph Land and Company, Inc. (hereinafter "Land") a truck broker. In each case perishable goods were transported by Hams trucks from producers on the West Coast of the United States to wholesale markets on the East Coast.

As to two of the loads, there is no dispute regarding timeliness or quality of delivered goods. As to the other three, however, Land asserts that it sustained direct losses resulting either from spoilage or market decline. Land attributes the market decline to late arrivals of produce.

There is no dispute as to the per load invoice amounts due Hams or the calculation of brokerage commissions which were to be paid Land.

The court already has found jurisdiction over plaintiff's claims under 28 U.S.C. §§ 1337 and 1332(a). Memorandum and Order, filed January 23, 1980.

## I. FINDINGS OF FACT

Pursuant to Rule 52(a) Fed.R.Civ.P., the court makes the following findings of fact:

1. Hams is a Pennsylvania corporation having its principal place of business in Pennsylvania.

2. Land is a corporation organized in and existing under the laws of a state other than Pennsylvania and has its principal place of business in Florida.

3. The amount in controversy, exclusive of interest and costs, is in excess of $10,000.

4. Customarily, the contractual relationship between Hams and Land arises when either determines that Hams has an empty truck in a geographical area and field produce is desired to be shipped from that area to or beyond the return point of the empty truck. In such instances, by telephone, Ham contacts, or is contracted by, a truck broker, such as Land, who for a commission

directs the empty truck to specific locations, where the produce is loaded for shipment to its market.

5. As broker, Land is responsible to the produce owner or consignee for the condition and timely delivery of the produce.

6. Hams is responsible for proper delivery of the goods to the destination point Land chooses. When Hams effects such delivery, it is entitled to the cost of carriage, i. e., freight.

7. All of the transactions in this action were entered into by the parties by telephone.

### A. Load W–38

8. Hams carried a load of produce identified as Load W–38 for Land commencing on June 12, 1978 for the agreed price, after deduction of brokerage, of $2,325.00. This load was accepted by the consignee without objection. No dispute exists as to the amount each party owes.

### B. Load W–47

9. Hams also carried a load of produce identified as Load W–47 for Land, which was delivered on or about June 20, 1978, for the agreed price, after deduction of brokerage, of $2,484.00. This load also was accepted by the consignee without objection. There is no dispute regarding the respective amounts owed by the parties.

### C. Load W–41

10. Hams carried a load of produce identified as Load W–41 for Land from Washington State to Hunter Brothers in Philadelphia commencing on June 14, 1978, for the agreed freight, after deduction of brokerage of $2,506.63. (P–2a, 2b, 2c).

11. Load W–41 arrived in Philadelphia on Sunday morning, June 18, 1978. Two delivery attempts were made, the latter being at 8:00 a. m. The consignee's place of business did not open until noon on Sunday, the 18th. Load W–41 was not delivered until 6:30 a. m. on Monday, June 19, 1978.

12. Although no time of delivery was specified on the bills of lading relating to Load W–41, there was a telephonic agreement that the goods would be delivered at noon to the consignee's place of business. Hams failed to take reasonable steps to deliver the goods on June 18, 1978 in that the driver did not attempt delivery after 8.00 a. m., did not call Hunter Brothers thereafter, and did not report the failure of delivery to the Hams dispatcher who was on duty. The produce remained in the truck parked at the Hams terminal until the morning of June 19, 1978 when it was delivered.

13. The testimony of Mr. Purinton is credited that there was a declining market for the produce and that the failure of timely delivery could have been the proximate cause of some loss experienced by the consignee.

14. In support of its counterclaim, Land relies entirely upon the testimony of Mr. Purinton that he was told by the consignee that the loss could have been worse than $950.00 "had the market declined, but Hunter Brothers came out of it pretty good, that all he was looking for was the $950.00." (N.T. 123). However, there is no evidence as to the sum Hunter Brothers actually received for the produce and hence no reliable basis for determining whether and the extent to which the consignee suffered a loss related solely to the produce.

15. On the counterclaim, Land has failed to prove by a fair preponderance of the evidence that it suffered any loss that can be reasonably ascertained. Accordingly, the counterclaim for $950.00 is denied.

16. Therefore, the amount Land owes Hams on Load W–41, less brokerage credit, is $2,506.63.

### D. Load W–44

17. Produce identified as Load W–44 was loaded by the produce shipper in California and carried by Hams to the place of business of the consignee, A. Cancelmo Co., in Philadelphia.

18. While it did not have the responsibility for proper loading, Hams did have responsibility for maintaining the required temperature levels in the sealed trailer by monitoring and manually adjusting the controls of the refrigeration unit located on the

outside of the trailer. An instrument known as a Ryan Recorder was located inside the trailer and recorded automatically the temperature of air that was pumped through the refrigeration unit into the trailer.

19. The court finds the parties made it a condition of their contract that throughout the trip the carrier maintain the temperature of the cargo at 36 degrees Fahrenheit. (N.T. 87) The uncontradicted evidence, through the Ryan Recorder tape, is that the required temperature was not maintained throughout the trip. For the first eight hours the temperature was maintained at 36 degrees, for the next 24 hours it was at 40 degrees, for the next 24 hours, 45 degrees, for the next 24 hours, 52 degrees, and the last twelve hours it started back down to 48 degrees.

20. The delivery was timely made. However, when the trailer was opened, the consignee rejected the goods because the temperatures had not been properly maintained. Most of the goods were then sold at auction. Seventy-three boxes of nectarines and plums were totally rejected by the auction company because of broken wooden nectarine boxes and wet paper plum boxes. (N.T. 101–02). For these, the consignee made a claim against Land of $767.55. However, the nectarines were sold through Mr. Purinton's efforts for $205.00, leaving $562.55, which Land seeks to pass on to Hams.

21. To mitigate loss, Land directed that the remaining produce be sold at auction on the Philadelphia Fruit Exchange. The sale produced a net of $14,377.07 ($15,075.50 gross sales less $698.43 for the Exchange's commission and unloading charges) as compared to the consignee's purchase price of $15,422.60. Thus, there was a loss of $1,045.53.

22. Hams' failure to maintain the correct temperature on the load was a breach of condition, the proximate cause of the consignee's rejection of the goods, and required the mitigating auction sale of the produce. However, there is no competent proof of any loss occasioned beyond the $1,045.53 discussed in paragraph 21.

23. The consignee failed or refused to pay Land the freight cost of $2,511.00, alleging, as stated by Mr. Purinton, for Land, that its total losses exceeded the freight cost. (N.T. 127–128).

24. It is uncontradicted that the industry practice is to assess losses associated with damaged goods by determining the difference between the price paid for the goods and the price actually received. The market price for undamaged produce is irrelevant. (N.T. 129–131).

25. Therefore, applying the industry's own trade custom, the amount Hams owes Land regarding the counterclaim is the purchase price less the market value of the damaged goods, i. e., $15,422.60 minus $14,377.07 or $1,045.53.

26. The consignee rejected seventy three boxes of produce because the boxes were broken and wet. However, Land failed to adduce evidence that the produce and boxes were in good condition when the shipper loaded them on the Hams truck. Furthermore, Land produced no competent evidence that Hams negligently transported the boxes or that any Hams' negligence proximately caused the wooden boxes to break or the other boxes to become wet.

27. The amount owed Hams by Land, after deduction of commission for Load W–44 is the freight less the amount allowed on Land's counterclaim, i. e., $2,322.00 minus $1,045.53, or $1,276.47.

### E. Load W–45

28. Produce identified as Load W–45 and carried by Hams was loaded by the produce packer in California and not by Hams. It was a dual load for consignee, H. Schnell, in New York City.

29. Mr. Purinton testified for Land that he was told by the consignee that the produce was rejected because it had arrived late and had not been maintained at the proper shipping temperature.

30. The cargo did arrive timely in New York City on June 20, 1978, being within the normal running time for coast to coast

truck shipments. (N.T. 20–26). The bill of lading did not specify an arrival time and there was no other evidence of a definite arrival time.

31. However, Land failed to produce at trial the Ryan Recorder tape which would have been the only evidence of the trailer temperature which was maintained by Hams during shipment. Nor did Land introduce evidence that the goods were in good condition when delivered to Hams. Therefore, no competent evidence exists on which to conclude that Hams was negligent or that such negligence was the proximate cause of the spoilage. According to Land's own evidence, the Ryan Recorder could have been operating properly and yet there could have been spoilage for which the carrier would have no responsibility. (N.T. 103).

32. Accordingly, Land's counterclaim as to Load W–45 is denied. Hams is owed the sum of $2,756.36, less commission, or $2,576.00.

### F. Summary of Amounts Due

| LOAD | FREIGHT LESS BROKERAGE | SET OFF | DUE |
|------|------------------------|---------|-----|
| W–38 | $2,325.00 | $ 0 | $2,325.00 |
| W–41 | 2,506.63 | 0 | 2,506.63 |
| W–44 | 2,322.00 | 1,045.53 | 1,276.47 |
| W–45 | 2,576.00 | 0 | 2,576.00 |
| W–47 | 2,484.00 | 0 | 2,484.00 |
| | | | |
| TOTALS | $12,213.63 | $1,045.53 | $11,168.10 |

## II. DISCUSSION

### A. Load W–41

Land has failed to prove by competent evidence that consignee, Hunter Brothers, suffered any loss directly related to the subsequent sale of the produce. "While the fact of damage must be established with reasonable certainty, the precise amount need not be shown with mathematical precision so long as the court can arrive at an intelligent estimate without speculation or conjecture." *First National Bank of Chicago v. Jefferson Mortgage Co.*, 576 F.2d 479, 494–495 (3d Cir. 1978), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). *Accord, Air Filter Co., Inc. v. McNichol*, 527 F.2d 1297, 1301 (3d Cir. 1975).

However, here the court is not convinced by a preponderance of the evidence that Land has met its burden of proving with reasonable certainty that it suffered measurable damages. Even if the court were persuaded that Land suffered some loss, the court is without a sufficient evidentiary basis to ascertain the extent of Land's damage without resorting to conjecture and mere speculation. This the court may not do. *First National Bank of Chicago, supra; McNichol, supra.* As the *McNichol* court stated: "While we agree that 'the quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage,'...it is also elementary that purely speculative damages cannot be recovered." 527 F.2d at 1301 (citations omitted). *Accord, Harrison Associates v. Gulf States Utilities Co.*, 491 F.2d 578, 587 (5th Cir. 1974). *See also, Blackburn v. Aetna Freight Lines, Inc.*, 368 F.2d 345 (3d Cir. 1966); *McNichol, supra; Vizzini v. Ford Motor Co.*, 569 F.2d 754, 763 (3d Cir. 1977). Since Land has failed to prove such facts, its counterclaim of $950.00 fails.

### B. Load W–44

The court has found that a trade custom existed for determining loss by subtracting the market value of damaged goods from the contract price.

In cases involving carrier liability the courts attempt to compensate the injured party for his "actual loss." *Hector Martinez & Co. v. Southern Pacific Transportation Co.*, 606 F.2d 106, 110–111 (5th Cir. 1979); *McCarty v. Southern Pacific Co.*, 428 F.2d 690, 692 (9th Cir. 1979); *Illinois Central R.R. Co. v. Zucchero*, 221 F.2d 934, 937 (8th Cir. 1955). *See also, Frosty Land Foods v. Refrigerated Transport*, 613 F.2d 1344, 1348 (5th Cir. 1980). In the absence of a contrary industry practice, courts have determined actual loss by the market price measure of damages, that is, the difference between the market value of goods delivered according to the contract specifica-

tions, and the market value of nonconforming goods. *Gulf, Colorado & Santa Fe R.R. Co. v. Texas Packing Co., et al.*, 244 U.S. 31, 37, 37 S.Ct. 487, 489, 61 L.Ed. 970 (1917); *Frosty Land Foods*, 613 F.2d at 1348 (*dictum*); *Fraser–Smith Co. v. Chicago, Rock Island & Pacific R.R. Co.*, 435 F.2d 1396, 1402 (8th Cir. 1971). However, this court will not impose upon the parties a standard for ascertaining damages which is different than the one found in this case to have been uniformly adopted and routinely followed by brokers in the perishable produce trade. Moreover, there is no evidence that this practice was inequitable. Accordingly, Land is entitled to succeed on its counterclaim to the extent of $1,045.53.

 On the issue of carrier liability for the wet and broken boxes, the United States Supreme Court's holding in *Missouri Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964) is applicable and dispositive. The Court stated that under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his *prima facie* case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. *Accord, Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.*, 616 F.2d 619, 625 (2nd Cir. 1980); *Kaiser Aluminum & Chemical v. Illinois Central Gulf Railroad Company*, 615 F.2d 470, 474 (8th Cir. 1980). Here, Land has failed to establish a *prima facie* case of negligence. It has not shown by a fair preponderance of the evidence that the boxes and goods in them were loaded and otherwise delivered to Hams in good condition in California. The uncontroverted testimony is that the produce was loaded by the field producers and that Hams had no responsibility for loading. Land presented no evidence as to how the boxes were loaded or the boxes' condition when loaded.

Accordingly, Land is not entitled to prevail on its claim for damages flowing from the consignee's rejection of the broken and wet boxes. The amount which Land owes Hams on Load W–44 is $2,322.00 less $1,045.53 (the amount allowed on the im-

proper maintenance of temperature counterclaim) or $1,276.47.

### C. Load W–45

 Land has failed to make out a *prima facie* claim of damages regarding Load W–45. Land failed to show that the goods were delivered to Hams in good condition and thus failed to meet the first part of the tripartite test enunciated by the Supreme Court in *Missouri Pacific Railroad, supra.* No proof exists by a fair preponderance of the evidence that Hams received the goods in good condition.

The court rejects the counterclaim of Land and finds in favor of Hams Express in the amount of $2,484.00.

## III. CONCLUSION

1. There exists diversity jurisdiction in that the parties are corporate citizens of different states and the amount in controversy exceeds $10,000.00.

2. Regarding Load W–41, Land has failed to prove that it is reasonably certain that Land suffered damage. Even assuming Land suffered damage, the facts do not constitute a reasonably fair basis upon which the court, acting as finder of fact, can calculate loss.

 3. Where the facts disclose a trade custom which compensates a consignee or shipper for his actual loss due to carrier negligence, the court may adopt that trade custom in ascertaining damages. To calculate loss, the court need not invariably subtract the market value of damaged goods from that of undamaged goods.

4. Land failed to establish a *prima facie* case of carrier negligence in part as to Load W–44 (broken and wet boxes), and entirely as to Load W–45.

5. Land owes Hams the sum of $11,168.10 plus legal interest.

6. An appropriate Order shall be entered.