AQUAMARINE ASSOCIATES, A Texas
Partnership, Appellant,

v.

BURTON SHIPYARD, INC. et
al., Appellees.

No. 8456.

Court of Appeals of Texas,
Beaumont.

June 17, 1982.

Rehearing Denied July 29, 1982.

W.E. Wright, Houston, for appellant.

O.J. Weber, Jr., Beaumont, George Sladczyk, Jr., Port Arthur, for appellees.

KEITH, Justice.

Plaintiff below appeals from a judgment entered after the trial court had disregarded several jury answers, the result being a serious diminution in the amount of damages awarded to plaintiff.

Plaintiff was a partnership known as Aquamarine Associates[1] which sued defendant, Burton Shipyard, and its president,

J.C. Garner. The record is unusually large[2] and the factual presentation of the questions, by both parties, leaves much to be desired.

Basically, the suit is one for breach of contract and the damages flowing therefrom. Plaintiff sued Burton because the latter did not fulfill its contract for the construction of four vessels. Burton, acting through Garner, contracted to build and deliver four ocean-going vessels, the prices and the delivery dates being set out in the margin.[3]

Burton breached its contract and did not begin the timely construction of the last three hulls as required. Instead, in February of 1974, while in default upon the second hull, it refused to proceed with construction unless plaintiff agreed to an increase in price and a delayed delivery date.

Plaintiff then negotiated with Texas Maritime Industries ("TMI") and contracted for the completion of the Burton contract, but at an increased cost of nearly $700,000 over the Burton contract. According to plaintiff, the negotiations were in good faith and at arms' length. TMI was not an experienced builder and it suffered financial difficulties before it "went broke." Two of plaintiff's partners, Cuenod and Chadwick, then acquired the physical assets of TMI and changed its name to South Texas Shipyards ("STS"). They then contracted with their third partner, Gilbert, in a contract whereby STS agreed to act as a substitute to "cover" for the Burton de-

---

1. The partners were Ronald P. Cuenod, James H. Chadwick, and Thomas Gilbert, each of whom will be referred to by his surname, with the partnership being designated as plaintiff.

2. The trial lasted for longer than two months and we have a statement of facts consisting of 5,249 pages, a box containing 170 exhibits, and a transcript of 413 pages. The charge contained more than 50 numbered questions, many of which contained lettered sub-parts.

The trial court sustained *Tex.R.Civ.P. 301* motions disregarding several issues. Plaintiff and defendant both challenge the action of the trial court and the sufficiency of the evidence by multiple points and crosspoints.

Our resume of the facts and discussion of the record, while lengthy and prolix, will be limited in its scope.

3.

| Hull Number | Price | Delivery Date |
|---|---|---|
| 504 | $1,538,000 | November 1, 1973 |
| 505 | 1,533,000 | December 31, 1973 |
| 516 | 1,533,000 | April 1, 1974 |
| 517 | 1,543,000 | June 1, 1974 |

Hull No. 504 was completed and is not involved in this suit.

fault.[4] These contract prices included a ten percent profit for the two partners of plaintiff who then owned STS.

STS did not meet either the contractual prices or delivery dates of Hulls 505 or 516.[5] It is to be noted that the initial contract between the partners did not cover the construction by STS of Hull 517. Later, an agreement was reached but STS did not finish the vessel and it was towed to Halter Marine in Mississippi for completion after Cuenod and Chadwick sold out their interest in STS. Hull 517 was finally delivered in August 1978 at a cost of almost four million dollars.

This lengthy resume of the evidence, most of which is undisputed and from the testimony of the principals, brings us to the discussion of the first series of complaints— those relating to "cover". The core of the problem is the cost of reasonable "cover." Stated differently, if the TMI contract was reasonable, then no error is shown because the trial court awarded the damages resulting from the Burton breach based upon that hypothesis. Conversely, if the costs incident to the STS-Halter Marine transactions constituted reasonable cover, error has been shown.

We turn first to a consideration of plaintiff's points four through eleven challenging the court's actions with reference to the jury findings on this aspect of the appeal.

■ The rule governing review of a trial court's actions under *Tex.R.Civ.P. 301* were restated in *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 777 (Tex.1974): "[I]t must be determined that there is no evidence upon which the jury could have made the findings relied upon." And, as said in *Williams v. Bennett*, 610 S.W.2d 144, 145 (Tex.1980):

> "In making this determination we must review the record in the light most favorable to the jury findings considering only the evidence and inferences which support them, and rejecting the evidence and inferences contrary to the findings."[6]

We begin our discussion of the damage question with an overview of the concept of "cover" as used in Special Issues 47 and 48. These issues were derived from *Tex.Bus. & Comm.Code Ann. § 2.712 (1968),* quoted in the margin.[7] The jury found that plaintiff acted in good faith and without unreasonable delay in its "cover" operation, but the issues were not broken down as to the participants in the "cover"—i.e., whether the inquiry was directed to the TMI agreement, or the STS substitute, or even Halter Marine.

The findings are summarized:

| No. 49(A) | Actual Replacement Costs: | $7,938,277. |
|---|---|---|
| No. 49(B) | Reasonable Replacement Costs | 5,984,000. |
| [Burton's contract price | ..................... | 4,609,000.] |

■ Special Issue No. 50 was taken from *§ 2.713* of the Code and the jury found the damages to be $1,991,000. This answer was properly disregarded as immaterial since *§ 2.713* is applicable only when the buyer has not "covered" as set out in the preceding section of the Code quoted in the footnote. See *§ 2.713, Comment 5.*[8]

---

**4.** This new contract increased the prices of Hulls 505 and 516 to $2,545,575 and $2,613,220, respectively, and the period of construction for each hull was fixed at one year.

**5.** Hull 505 was delivered in February 1976 at a cost of almost three million dollars; No. 516 came along in January 1977 at a cost of more than $3.6 million dollars.

**6.** The trial court may also disregard an issue which is immaterial. *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966); *Simpson v. Phillips Pipe Line Co.,* 603 S.W.2d 307, 311 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.).

**7.** *Bus. & Comm.Code § 2.712:*

"(a) After a breach ... the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(b) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages ....

"(c) Failure of the buyer to effect cover within this section does not bar him from any other remedy."

**8.** *Comment 5:* "The present section provides a remedy which is completely alternative to cover under the preceding [§ 2.712] section and applies only when and to the extent that the buyer has not covered." See generally, *Cargill,*

Defendants attack the jury finding of "reasonable cost" of the substituted vessels, as found in Special Issue No. 49(B) by pointing to the fact that the evidence supporting the increased costs incurred with STS was hearsay in nature and was stricken from the record on the trial court's own motion. This, according to defendant, left only the TMI contract supported by evidence on the question of "cover". From our examination of the record, we agree. It is elementary that hearsay evidence has no probative value and will not support a finding or a judgment, even if admitted without objection. *Texas Co. v. Lee,* 138 Tex. 167, 157 S.W.2d 628, 631 (1941); *Aetna Ins. Co. v. Klein,* 160 Tex. 61, 325 S.W.2d 376, 381 (1959). See also, *Durant Chevrolet Co. v. Industrial Towel & Uniform Co.,* 624 S.W.2d 628, 632 (Tex.Civ.App.—Fort Worth 1981, no writ), and cases therein cited.

Under *Code § 2.712,* as set out in *Comment 2,* "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner . . . ." *Teenan v. Jurek,* 312 Minn. 292, 251 N.W.2d 698, 702 (Minn.Sup.1977). Plaintiff contends, and defendant does not deny, that the cover contract with TMI met both of the statutory tests. Moreover, our study of the record under the accepted standards noted earlier discloses that the *only* reasonable cost of cover supported by competent evidence was that of the TMI contract.[9]

Plaintiff argues that the measure of damage in a case such as this is the difference between the cost of cover and the contract price together with incidental or consequential damages. In the ordinary case this is the true rule. *Laredo Hides*

*Company, Inc. v. H & H Meat Products Company, Inc.,* 513 S.W.2d 210, 221–222 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.); *Tennell v. Esteve Cotton Co.,* 546 S.W.2d 346, 355 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.); *Jon-T Farms, Inc. v. Goodpasture, Inc.,* 554 S.W.2d 743, 750 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.). We agree with the contention that the foregoing cases support the *general* rule.

The inapplicability of the general rule stems from plaintiff's failure to sustain its burden of showing, by competent evidence of probative force, the essential elements of its consequential damages as noted earlier.

There are other reasons why plaintiff's reliance upon its contract with STS is misplaced. The internal dealings between the partners in STS and Aquamarine were not submitted to the jury for determination of reasonableness; and, upon the face of the record, such was not shown as a matter of law. Only by accepting a partial victory by relying upon the TMI finding of lawful cover has plaintiff established its right to recover.[10] Only by confining plaintiff to a recovery based upon TMI can we give full effect, as the trial court did, to the findings in Issues 47 and 48, of good faith and no unreasonable delay.

Plaintiff's concessions[11] have ruled out a recovery for the difference in the contract price for the vessels and market value of the vessels as well as the claim for lost profits. Our holding under this series of points simply confines plaintiff's recovery to the costs of the TMI cover and denies to it the sums it sought to recover from the

---

*Inc. v. Stafford,* 553 F.2d 1222, 1227 (10th Cir. 1977); *Ralston Purina Co. v. McFarland,* 550 F.2d 967, 971 (4th Cir.1977).

**9.** The cover contract by TMI provided for the delivery of the vessels for a total sum of $5,308,545 while the Burton contract called for delivery for the sum of $4,609,000. The difference in the two figures is $699,545; the trial court awarded $698,000. We do not attempt to account for the difference of $1,545 between the TMI contract and the trial court's award.

**10.** In the posture under which we review this contention, we do not reach defendants' objec-

tions, and there were many, as to the form and manner of submission of the cover issues.

**11.** The plaintiff concedes in its brief:

"[T]he jury found cover, thus rendering immaterial, the jury's findings on market value. Additionally, it is undisputed that Aquamarine did not have an operating history at the time the jury found Burton had breached the contract. Thus, the finding of lost profits is inapplicable and was properly disregarded by the Trial Court."

substitute cover arranged between the partners through STS.

We turn now to plaintiff's claim for consequential damages, noting that plaintiff has abandoned the claim for lost profits, as indeed it was required to do under the state of the law. *Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097 (1938), and its progeny.

Plaintiff also seeks damages for lost rental value of the vessels. It supports such contention by the testimony of one of its partners (Gilbert) who testified that if the vessels had been available, they would have been rented and put to use off the coast of Scotland. His testimony related to gross receipts from the rental of the vessels; costs and expenses incident to such rental were not shown.[12]

Additionally, the problem of the claim for lost rentals is further complicated because plaintiff's partnership proposed to charter the vessels to an affiliate, Aquamarine, Incorporated, which entity, in turn, would charter the vessels to third parties. This second entity would provide the crew under a "tie in arrangement" and, in so doing, would incur undisclosed expenses including the wages for the crew, payroll taxes, maintenance and care, insurance, etc., but a recapitulation of such costs is not included in the summaries of the evidence brought to our attention. It is clear, however, that the daily rate, even for the so-called "bare boat" charters, was the gross rental, not the net sums remaining after the deduction of the costs incident thereto.

■ Just as net profit—not gross profit—is recoverable in such situations [as discussed in *Copenhaver v. Berryman,* 602 S.W.2d 540, 544 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd, n.r.e.)], so only net rentals are recoverable in a breach of contract case. Nor is it enough that net profits were merely anticipated or hoped for; they must be established with reasonable certainty. See *Atomic Fuel Extraction Corp. v. Slick's Estate,* 386 S.W.2d 180, 189 (Tex. Civ.App.—San Antonio 1964), writ ref'd n.r.e., per curiam, 403 S.W.2d 784 (Tex. 1965); *City of Austin v. Teague,* 570 S.W.2d 389, 395 (Tex.1978).

Under the record, Issue No. 52 was properly disregarded by the trial court.

■ In addition to damages for breach of the contract, plaintiff sought damages for fraud. It procured jury findings, on conflicting testimony, substantiating its claim; but, the jury negated the findings in its answer to Special Issue No. 14 that when Garner made the promise to deliver the vessels on time as provided in the contract, he intended to so deliver. It has long been the rule that a promise to do something in the future cannot form the basis of actionable fraud unless it be shown that the promisor, at the time he made the promise, had no intention of performing it. *Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex.1971). See also, *Foster v. Reed,* 623 S.W.2d 494, 495 (Tex.Civ.App.—Beaumont 1981, no writ), and authorities therein cited.

The trial court properly denied the claim for exemplary damages, and the first three points of error are overruled.

■ The final complaint requiring attention is the claim that the trial court erred in granting peremptory strikes to both Garner and Burton when there was no conflict of interest in the pleadings or in fact. See generally, *Perkins v. Freeman,* 518 S.W.2d 532 (Tex.1974); and *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914 (Tex.1979).

From our review of the record, we do not find any valid reason supporting the grant of the excess challenges. On the face of the presentation, under this record, error has been shown.

---

12. Mr. Gilbert defined "day rate" as "the *gross* income the vessel earns when it's chartered to a client."

Burton objected to testimony relating to "day rates unless it's coupled with information of operating costs and all the other matters that would show profits, that's what this law suit is about . . . ." The trial court sustained the objection including in the ruling: ". . . that [day rate] is no criteria of the profits that are made unless you can show from that daily rate what profits were actually realized."

But, this does not end the matter since we must consider if the granting of the excessive number of strikes constituted reversible error. Plaintiff makes no contention that it was confronted with an objectionable juror and has made no serious effort to demonstrate harm resulting from the excessive strikes exercised by the two defendants. The application of the harmless error rule (*Tex.R.Civ.P. 434*) to this situation, as authorized by *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 821 (Tex.1980), presents a judgment call. *Gomez Leon v. State*, 426 S.W.2d 562, 565 (Tex.1968). From our review of the record, we do not find that the number of peremptory challenges granted the defendants resulted in a "materially unfair" trial so as to require a reversal under *Tex.R.Civ.P. 434. Larusso v. Members Mut. Ins. Co.*, supra.

We have disposed of the basic complaints brought forward and, while we have not mentioned each point specifically, our examination does not disclose reversible error. The discrepancy in the damage award, as shown in footnote 9, can and will be corrected by a reformation of the judgment. With the correction and reformation, the judgment in favor of plaintiff is affirmed.

Defendants have brought forward a series of crosspoints, many of which are virtually answers to plaintiff's contentions submitted along with appropriate counterpoints. We find no merit to such crosspoints and each is overruled.

The judgment of the trial court is reformed so as to increase plaintiff's damage by the sum of $1,545 and, as reformed, the judgment is affirmed.

CLAYTON, J., not participating.