**COSDEN OIL & CHEMICAL COMPANY, Plaintiff-Appellant Cross-Appellee,**

v.

**KARL O. HELM AKTIENGESELLSCHAFT, Defendant-Appellee Cross-Appellant.**

No. 82–1528.

United States Court of Appeals, Fifth Circuit.

July 23, 1984.

---

Johnson & Swanson, Thomas A. Graves, Ernest E. Figari, Jr., Dallas, Tex., for plaintiff-appellant cross-appellee.

Coke & Coke, Thomas W. Craddock, Robert B. Krakow, J. Edwin Fleming, Dallas, Tex., James A. Lowe, Orlando, Fla., for defendant-appellee cross-appellant.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

REAVLEY, Circuit Judge:

We must address one of the most difficult interpretive problems of the Uniform Commercial Code—the appropriate time to measure buyer's damages where the seller anticipatorily repudiates a contract and the buyer does not cover. The district court applied the Texas version of Article 2 [1] and

---

**1.** The Uniform Commercial Code is codified as Title 1 of the Business and Commerce Code,

measured buyer's damages at a commercially reasonable time after seller's repudiation. We affirm, but remand for modification of damages on another point.

## I. CASE HISTORY

This contractual dispute arose out of events and transactions occurring in the first three months of 1979, when the market in polystyrene, a petroleum derivative used to make molded products, was steadily rising. During this time Iran, a major petroleum producer, was undergoing political turmoil. Karl O. Helm Aktiengesellschaft (Helm or Helm Hamburg), an international trading company based in Hamburg, West Germany, anticipated a tightening in the world petrochemical supply and decided to purchase a large amount of polystyrene. Acting on orders from Helm Hamburg, Helm Houston, a wholly-owned subsidiary, initiated negotiations with Cosden Oil & Chemical Company (Cosden), a Texas-based producer of chemical products, including polystyrene.

Rudi Scholtyssek, general manager of Helm Houston, contacted Ken Smith, Cosden's national sales coordinator, to inquire about the possibility of purchasing quantities of polystyrene. Negotiating over the telephone and by telex, the parties agreed to the purchase and sale of 1250 metric tons [2] of high impact polystyrene at $.2825 per pound and 250 metric tons of general purpose polystyrene at $.265 per pound. The parties also discussed options on each polystyrene type. On January 18, 1979, Scholtyssek met with Smith in Dallas, leaving behind two purchase confirmations. Purchase confirmation 04 contained the terms for high impact and 05 contained the

terms for general purpose. Both confirmations contained the price and quantity terms listed above, and specified the same delivery and payment terms. The polystyrene was to be delivered during January and February in one or more lots, to be called for at Helm's instance. Confirmation 04 specified that Helm had an option for an additional 1000 metric tons of high impact, and confirmation 05 expressed a similar option for 500 metric tons of general purpose. The option amounts were subject to the same terms, except that delivery was to be during February and March. The options were to be declared, at the latest, by January 31, 1979.

On January 22, Helm called for the first shipment of high impact under order 04, to be delivered FAS at a New Jersey port to make a January 29 shipping date for a trans-Atlantic voyage. On January 23, Helm telexed Cosden to declare the options on purchase orders 04 and 05, designating the high impact option quantity as order 06 and the general purpose option quantity as order 07. After exercising the options, Helm sent purchase confirmations 06 and 07, which Cosden received on January 29. That same day Helm Houston received confirmations 04 and 05, which Smith had signed.

Cosden shipped 90,000 pounds of high impact polystyrene to Helm on or about January 26. Cosden then sent an invoice for that quantity to Helm Houston on or about January 31. The front of the invoice stated, "This order is subject to the terms and conditions shown on the reverse hereof." Among the "Conditions of Sale" listed on the back of the invoice was a force majeure provision.[3] Helm paid for the first

---

Tex.Bus. & Com.Code Ann. (Vernon 1968 & Supp.1984). All mention or citation within this opinion to "the Code" and to individual Code sections and comments are intended to refer to the Texas Business and Commerce Code, unless designated otherwise.

**2.** One metric ton equals approximately 2,204.5 pounds.

**3.** No liability hereunder shall result to either party from delay in performance or nonper-

formance caused by circumstances beyond the control of the party affected including, but not limited to: Acts of God, fire, flood, war, governmental regulation, direction or request, accident, strike, labor trouble, shortage of or inability to obtain material, equipment or transportation. The affected party may omit purchases or deliveries during the period of continuance of such circumstances and the contract quantities shall be reduced by the quantities so omitted.

shipment in accordance with the agreement.

As Helm had expected, polystyrene prices began to rise in late January, and continued upward during February and March. Cosden also experienced problems at two of its plants in late January. Normally, Cosden supplied its Calumet City, Illinois, production plant with styrene monomer, the "feed stock" or main ingredient of polystyrene,[4] by barges that traveled from Louisiana up the Mississippi and Illinois Rivers to a canal that extended to Cosden's plant. Due to the extremely cold winter of 1978–79, however, the Illinois River and the canal froze, suspending barge traffic for a few weeks. A different problem beset Cosden's Windsor, New Jersey, production plant. A new reactor, used in the polystyrene manufacturing process, had recently been installed at the Windsor plant. A manufacturing defect soon became apparent, however, and Cosden returned the reactor to the manufacturer for repair, which took several weeks. At the time of the reactor breakdown, Cosden was manufacturing only general purpose at the Windsor plant. Cosden had planned on supplying Helm's high impact orders from the Calumet City plant.

Late in January Cosden notified Helm that it was experiencing problems at its production facilities and that the delivery under 04 might be delayed. On February 6, Smith telephoned Scholtyssek and informed him that Cosden was cancelling orders 05, 06, and 07 because two plants were "down" and it did not have sufficient product to fill the orders. Cosden, however, would continue to honor order 04. Smith confirmed the cancellation in a letter dated February 8, which Scholtyssek received on or about February 12. After Helm Hamburg learned of Cosden's cancellation, Wolfgang Gordian, a member of Helm's executive board, sent an internal memorandum to Helm Houston outlining a strategy. Helm would urge that Cosden continue to

perform under 04 and, after receiving the high impact polystyrene, would offset amounts owing under 04 against Helm's damages for nondelivery of the balance of polystyrene. Gordian also instructed Helm Houston to send a telex to Cosden. Following instructions, Scholtyssek then requested from Cosden "the relevant force majeure certificate" to pass on to Helm Hamburg. Helm also urged Cosden to deliver immediately several hundred metric tons of high impact to meet two February shipping dates for which Helm had booked shipping space.

In mid-February Cosden shipped approximately 1,260,000 pounds of high impact to Helm under order 04. This shipment's invoice, which also included the force majeure provision on the reverse side, specified that Helm owed $355,950, due by March 15 or 16. After this delivery Helm requested that Cosden deliver the balance under order 04 for shipment on a vessel departing March 16. Cosden informed Helm that a March 16 delivery was not possible. On March 15, citing production problems with the 04 balance, Cosden offered to sell 1000 metric tons of styrene monomer at $.41 per pound. Although Cosden later lowered the price on the styrene monomer, Helm refused the offer, insisting on delivery of the balance of 04 polystyrene by March 31 at the latest. Around the end of March, Cosden informed Scholtyssek by telephone that it was cancelling the balance of order 04.

Cosden sued Helm, seeking damages for Helm's failure to pay for delivered polystyrene. Helm counterclaimed for Cosden's failure to deliver polystyrene as agreed. The jury found on special verdict that Cosden had agreed to sell polystyrene to Helm under all four orders. The jury also found that Cosden anticipatorily repudiated orders 05, 06, and 07 and that Cosden cancelled order 04 before Helm's failure to pay for the second 04 delivery constituted a repudiation. The jury fixed the per pound market prices for polystyrene under

---

**4.** Styrene monomer comprises approximately 90% of high impact polystyrene and a larger

percentage of general purpose polystyrene.

each of the four orders at three different times: when Helm learned of the cancellation, at a commercially reasonable time thereafter, and at the time for delivery.

The district court, viewing the four orders as representing one agreement, determined that Helm was entitled to recover $628,676 in damages representing the difference between the contract price and the market price at a commercially reasonable time after Cosden repudiated its polystyrene delivery obligations and that Cosden was entitled to an offset of $355,950 against those damages for polystyrene delivered, but not paid for, under order 04.

## II. TIME FOR MEASURING BUYER'S DAMAGES

Both parties find fault with the time at which the district court measured Helm's damages for Cosden's anticipatory repudiation of orders 05, 06, and 07.[5] Cosden argues that damages should be measured when Helm learned of the repudiation. Helm contends that market price as of the last day for delivery—or the time of performance—should be used to compute its damages under the contract-market differential. We reject both views, and hold that the district court correctly measured damages at a commercially reasonable point after Cosden informed Helm that it was cancelling the three orders.

Article 2 of the Code has generally been hailed as a success for its comprehensiveness, its deference to mercantile reality, and its clarity. Nevertheless, certain aspects of the Code's overall scheme have proved troublesome in application. The interplay among sections 2.610, 2.711, 2.712, 2.713, and 2.723, Tex.Bus. & Com.Code Ann. (Vernon 1968), represents one of those areas, and has been described as "an impossible legal thicket." J. White & R. Summers, *Uniform Commercial Code*

§ 6–7 at 242 (2d ed. 1980). The aggrieved buyer seeking damages for seller's anticipatory repudiation presents the most difficult interpretive problem.[6] Section 2.713 describes the buyer's damages remedy:

Buyer's Damages for Non-Delivery or Repudiation

(a) Subject to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price *at the time when the buyer learned of the breach* and the contract price together with any incidental and consequential damages provided in this chapter (Section 2.715), but less expenses saved in consequence of the seller's breach.

(emphasis added).

Courts and commentators have identified three possible interpretations of the phrase "learned of the breach." If seller anticipatorily repudiates, buyer learns of the breach:

(1) When he learns of the repudiation;

(2) When he learns of the repudiation plus a commercially reasonable time; or

(3) When performance is due under the contract.

*See, e.g., First National Bank of Chicago v. Jefferson Mortgage Co.,* 576 F.2d 479 (3d Cir.1978); *Cargill, Inc. v. Stafford,* 553 F.2d 1222 (10th Cir.1977); J. White & R. Summers § 6–7 at 240–52; Note, *U.C.C. § 2–713: Anticipatory Repudiation and the Measurement of an Aggrieved Buyer's Damages,* 19 Wm. & Mary L.Rev. 253 (1977).

We would not be free to decide the question if there were a Texas case on point, bound as we are by *Erie* to follow state law in diversity cases. We find, however,

---

**5.** The damages measurement problem does not apply to Cosden's breach of order 04, which was not anticipatorily repudiated. The time Helm learned of Cosden's intent to deliver no more polystyrene under 04 was the same time as the last date of performance, which had been extended to the end of March.

**6.** The only area of unanimous agreement among those that have studied the Code provisions relevant to this problem is that they are not consistent, present problems in interpretation, and invite amendment.

that no Texas case has addressed the Code question of buyer's damages in an anticipatory repudiation context. Texas, alone in this circuit, does not allow us to certify questions of state law for resolution by its courts. *See United Services Life Insurance Co. v. Delaney,* 396 S.W.2d 855 (Tex. 1965).

■ *Fredonia Broadcasting Corp. v. RCA Corp.,* 481 F.2d 781 (5th Cir.1973) (*Fredonia I*), contains dicta on this question. The court merely quoted the language of the section and noted that the time for measuring market price—when buyer learns of the breach—was the only difference from pre-Code Texas law.[7] *Id.* at 800. *See* Anderson, *Learning of Breaches under Section 2–713 of the Code,* 40 Tex.B.J. 317, 320 (1977). We have found no Texas case quoting or citing *Fredonia I* for its dicta on damages under

section 2.713. Although *Fredonia I* correctly stated the statutory language, it simply did not address or recognize the interpretive problems peculiar to seller's anticipatory repudiation.[8]

Since *Fredonia I,* four Texas courts have applied section 2.713 to measure buyer's damages at the time he learned of the breach. *Hargrove v. Powell,* 648 S.W.2d 372 (Tex.App.—San Antonio 1983, no writ); *Jon-T Farms, Inc. v. Goodpasture, Inc.,* 554 S.W.2d 743 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.); *Tennell v. Esteve Cotton Co.,* 546 S.W.2d 346 (Tex.Civ.App. —Amarillo 1976, writ ref'd n.r.e.); *Wilson v. Hays,* 544 S.W.2d 833 (Tex.Civ.App.— Waco 1976, writ ref'd n.r.e.). In all of these cases the aggrieved buyer learned of the breach at or after the time of performance.[9]

---

7. Before Texas adopted the Code, its courts applied the traditional time-of-performance measure of damages in repudiation cases. *See, e.g., Henderson v. Otto Goedecke, Inc.,* 430 S.W.2d 120, 123–24 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.); Anderson, *Learning of Breaches Under Section 2–713 of the Code,* 40 Tex.B.J. 317, 318 & n. 7 (1977). By interpreting the time buyer learns of the breach to mean a commercially reasonable time after buyer learns of the repudiation, we depart from pre-Code law, although in a different manner than suggested by the dicta of *Fredonia I.* This panel, however, is not bound by dicta of a previous panel. *Curacao Drydock Co. v. M/V AKRITAS,* 710 F.2d 204 (5th Cir.1983).

8. In *Fredonia I,* the buyer, a television station, brought contract claims against the seller of broadcasting equipment. Fredonia claimed that delays in delivery and delivery of defective equipment by RCA caused Fredonia to miss its initial broadcast date and to suffer interruptions in broadcasting service. The jury found that RCA repudiated the contract by several acts or omissions—the same acts that supported other jury findings that RCA breached the contract. *Compare id.* at 791 & 809 (Interrogatory No. 9) *with id.* at 793 & 809–10 (Interrogatory No. 11). The *Fredonia I* court reversed the judgment on both the breach and repudiation claims. On remand, since Fredonia's contract claims were precluded by terms of the contract, the case was tried on a fraud theory. *Fredonia Broadcasting Corp. v. RCA Corp.,* 569 F.2d 251, 254 & n. 2 (5th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978) (*Fredonia II* ).

9. In *Hargrove,* seller failed to deliver approximately 230 lambs as agreed, and buyer sued for

damages under section 2.713. The court awarded the buyer market-contract damages measured at the time seller breached. Although the parties had not fixed an exact delivery date, the *Hargrove* court stated that a reasonable time for performance was applicable. "Both the breach and when appellee learned of it occurred ... when the time for performance expired or, if he had done so, when appellant repudiated the contract." 648 S.W.2d at 377. The court noted the alternatives because buyer at trial had failed to submit the issue of when he learned of the breach.

The dispute in *Jon-T Farms* involved a grain-supply contract with a final delivery date of November 30. Only one fifth of the sorghum had been shipped by that time, due to a shortage of rail cars. The parties extended the contract until December 10, the date that seller notified buyer by letter that the contract had expired. The jury found that this communication constituted a breach and/or a repudiation. Although the *Jon-T Farms* court characterized the letter as a repudiation, the facts of the case indicate that it occurred simultaneously with the end of the performance period. The court described the delivery of six carloads of grain between December 10 and 21 as "late performance." *Jon-T Farms,* 554 S.W.2d at 747.

In *Tennell,* the court fixed buyer's damages at the time he learned that seller would deliver no more cotton, a point contemporaneous with or later than the time for delivery. The contract was for one season's production of cotton. The opinion does not express an exact delivery time, but apparently the time for performance was after harvest and baling. After the entire cotton production had been harvested and baled, seller

Two recent Texas cases indicate that appropriate measure for buyer's damages in the anticipatory repudiation context has not been definitively decided. In *Aquamarine Associates v. Burton Shipyard,* 645 S.W.2d 477 (Tex.App.—Beaumont 1982), *aff'd,* 659 S.W.2d 820 (Tex.1983), seller anticipatorily repudiated its obligation to construct and deliver ships. After seller learned of the repudiation, it covered by contracting with another party to complete the vessels. Since buyer covered under section 2.712, the jury's answer to the section 2.713 damages issue was properly disregarded. Referring to comment 5 of section 2.713, however, the Texas Court of Civil Appeals cited two cases that measured buyer's damages for anticipatory repudiation at different times. *Id.* at 479 & n. 8. *Cargill, Inc. v. Stafford,* 553 F.2d 1222 (10th Cir.1977), held that buyer's damages for anticipatory repudiation should be measured at a commercially reasonable time after he learned of the repudiation if he should have covered, and at the time of performance if buyer had a valid reason for failure or refusal to cover. *Id.* at 1226–27. In *Ralston Purina Co. v. McFarland,* 550 F.2d 967 (4th Cir.1977), the court measured buyer's damages at the market price prevailing on the day seller anticipatorily repudiated. *Id.* at 971. The two citations in *Aquamarine* reveal uncertainty concerning the applicable time for measuring damages.

*Hargrove v. Powell,* 648 S.W.2d 372 (Tex.App.—San Antonio 1983, no writ), also indicates that the interpretation of section 2.713 in an anticipatory repudiation case has not been settled in Texas. In referring to the hypothetical case of seller's repudiation, the *Hargrove* court cited *Cargill* and Professor Anderson's article, which presents the argument that "time when the buyer learned of the breach" means the time for performance or later. *Id.* at 377; *see* Anderson, *supra.*

■ We do not doubt, and Texas law is clear, that market price at the time buyer learns of the breach is the appropriate measure of section 2.713 damages in cases where buyer learns of the breach at or after the time for performance. This will be the common case, for which section 2.713 was designed. *See* Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two,* 73 Yale L.J. 199, 264 (1963). In the relatively rare case where seller anticipatorily repudiates and buyer does not cover, *see* Anderson, *supra,* at 318, the specific provision for anticipatory repudiation cases, section 2.610, authorizes the aggrieved party to await performance for a commercially reasonable time before resorting to his remedies of cover or damages.[10]

■ In the anticipatory repudiation context, the buyer's specific right to wait for a commercially reasonable time before choosing his remedy must be read together with the general damages provision of section 2.713 to extend the time for measurement beyond when buyer learns of the breach. Comment 1 to section 2.610 states that if an aggrieved party "awaits performance

delivered less than one-third due under the contract and refused to deliver more cotton at the contract price. At this point, when the market price had risen substantially, buyer learned that seller would deliver no more.

The seller in *Wilson* delivered 200,000 bricks short of the quantity due under the contract. Buyer recovered the difference between the contract price and market price, which was five times the contract price at the time for performance.

**10.** Section 2.610 provides:

Anticipatory Repudiation

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(1) for a commercially reasonable time await performance by the repudiating party; or

(2) resort to any remedy for breach (Section 2.703 or Section 2.711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(3) in either case suspend his own performance or proceed in accordance with the provisions of this chapter on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2.704).

beyond a commercially reasonable time he cannot recover resulting damages which he should have avoided." This suggests that an aggrieved buyer can recover damages where the market rises during the commercially reasonable time he awaits performance. To interpret 2.713's "learned of the breach" language to mean the time at which seller first communicates his anticipatory repudiation would undercut the time that 2.610 gives the aggrieved buyer to await performance.

The buyer's option to wait a commercially reasonable time also interacts with section 2.611, which allows the seller an opportunity to retract his repudiation. Thus, an aggrieved buyer "learns of the breach" a commercially reasonable time after he learns of the seller's anticipatory repudiation. The weight of scholarly commentary supports this interpretation. *See* J. Calamari & J. Perillo, *Contracts* § 14–20 (2d ed. 1977); Sebert, *Remedies Under Article Two of the Uniform Commercial Code: An Agenda for Review*, 130 U.Pa.L.Rev. 360, 372–80 (1981); Wallach, *Anticipatory Repudiation and the UCC*, 13 U.C.C.L.J. 48 (1980); Peters, *supra*, at 263–68.

Typically, our question will arise where parties to an executory contract are in the midst of a rising market. To the extent that market decisions are influenced by a damages rule, measuring market price at the time of seller's repudiation gives seller the ability to fix buyer's damages and may induce seller to repudiate, rather than abide by the contract. By contrast, measuring buyer's damages at the time of performance will tend to dissuade the buyer from covering, in hopes that market price will continue upward until performance time.

Allowing the aggrieved buyer a commercially reasonable time, however, provides him with an opportunity to investigate his cover possibilities in a rising market without fear that, if he is unsuccessful in obtaining cover, he will be relegated to a market-contract damage remedy measured at the time of repudiation. The Code supports this view. While cover is the pre-ferred remedy, the Code clearly provides the option to seek damages. *See* § 2.712(c) & comment 3. If "[t]he buyer is always free to choose between cover and damages for non-delivery," and if 2.712 "is not intended to limit the time necessary for [buyer] to look around and decide as to how he may best effect cover," it would be anomalous, if the buyer chooses to seek damages, to fix his damages at a time before he investigated cover possibilities and before he elected his remedy. *See id.* comment 2 & 3; *Dura-Wood Treating Co. v. Century Forest Industries, Inc.*, 675 F.2d 745, 754 (5th Cir.), *cert. denied*, 459 U.S. 865, 103 S.Ct. 144, 74 L.Ed.2d 122 (1982) ("buyer has some time in which to evaluate the situation"). Moreover, comment 1 to section 2.713 states, "The general baseline adopted in this section uses as a yardstick the market in which the buyer would have obtained cover had he sought that relief." *See* § 2.610 comment 1. When a buyer chooses not to cover, but to seek damages, the market is measured at the time he could have covered—a reasonable time after repudiation. *See* §§ 2.711 & 2.713.

Persuasive arguments exist for interpreting "learned of the breach" to mean "time of performance," consistent with the pre-Code rule. *See* J. White & R. Summers, *supra*, § 6–7; Anderson, *supra*. If this was the intention of the Code's drafters, however, phrases in section 2.610 and 2.712 lose their meaning. If buyer is entitled to market-contract damages measured at the time of performance, it is difficult to explain why the anticipatory repudiation section limits him to a commercially reasonable time to await performance. *See* § 2.610 comment 1. Similarly, in a rising market, no reason would exist for requiring the buyer to act "without unreasonable delay" when he seeks to cover following an anticipatory repudiation. *See* § 2.712(a).

The interplay among the relevant Code sections does not permit, in this context, an interpretation that harmonizes all and leaves no loose ends. We therefore acknowledge that our interpretation fails to explain the language of section 2.723(a)

insofar as it relates to aggrieved buyers. We note, however, that the section has limited applicability—cases that come to trial before the time of performance will be rare. Moreover, the comment to section 2.723 states that the "section is not intended to exclude the use of any other reasonable method of determining market price or of measuring damages...." In light of the Code's persistent theme of commercial reasonableness, the prominence of cover as a remedy, and the time given an aggrieved buyer to await performance and to investigate cover before selecting his remedy, we agree with the district court that "learned of the breach" incorporates section 2.610's commercially reasonable time.[11]

### III. THE JURY'S SUBSTANTIAL–IMPAIRMENT FINDING

Cosden claims that the district court erred by refusing to give effect to the jury's finding that "Helm's failure to pay for polystyrene delivered under order 1004 on the date such payment was due substan-tially impaired the value to Cosden of any agreement with respect to such order." Arguing that order 04 was one of four distinct contracts, Cosden states that the substantial impairment finding is equivalent to finding that Helm breached the whole 04 "contract." *See* § 2.612(c). Cosden claims that it was entitled to suspend its performance under section 2.610(3) and that it is not liable for any undelivered amounts of polystyrene under 04.

The district judge correctly ignored the jury's finding of substantial impairment. In light of the bulk of the jury's findings and the evidence, the district court was required to give no legal effect to the finding in order to achieve harmony among the other answers. *See, e.g., Griffin v. Matherne*, 471 F.2d 911 (5th Cir.1973); *Stockton v. Altman*, 432 F.2d 946 (5th Cir.1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). Immediately following the substantial-impairment finding was a special issue on the repudiation or cancellation of order 04, coupled with written in-

11. We note that two circuits arrived at a similar conclusion by different routes. In *Cargill, Inc. v. Stafford*, 553 F.2d 1222 (10th Cir.1977), the court began its discussion of damages by embracing the "time of performance" interpretation urged by Professors White and Summers. *Id.* at 1226. Indeed, the court stated that "damages normally should be measured from the time when performance is due and not from the time when the buyer learns of repudiation." *Id.* Nevertheless, the court

> conclude[d] that under § 4-2-713 a buyer may urge continued performance for a reasonable time. At the end of a reasonable period he should cover if substitute goods are readily available. If substitution is readily available and buyer does not cover within a reasonable time, damages should be based on the price at the end of that reasonable time rather than on the price when performance is due.

*Id.* at 1227. The *Cargill* court would employ the time of performance measure only if buyer had a valid reason for not covering.

In *First Nat'l Bank of Chicago v. Jefferson Mortgage Co.*, 576 F.2d 479 (3d Cir.1978), the court initially quoted with approval legislative history that supports a literal or "plain meaning" interpretation of New Jersey's section 2-713. Nevertheless, the court hedged by interpreting that section "to measure damages within a commercially reasonable time after learning of the repudiation." *Id.* at 492. In light of the unequivocal repudiation and because cover was "easily and immediately ... available ... in the well-organized and easily accessible market," *id.* at 493 (quoting *Oloffson v. Coomer*, 11 Ill. App.3d 918, 296 N.E.2d 871 (1973)), a commercially reasonable time did not extend beyond the date of repudiation.

We agree with the *First National* court that "the circumstances of the particular market involved should determine the duration of a 'commercially reasonable time.'" 576 F.2d at 492; *see* Tex.Bus. & Com.Code § 1.204(b). In this case, however, there was no showing that cover was easily and immediately available in an organized and accessible market and that a commercially reasonable time expired on the day of Cosden's cancellation. We recognize that § 2.610's "commercially reasonable time" and § 2.712's "without unreasonable delay" are distinct concepts. Often, however, the two time periods will overlap, since the buyer can investigate cover possibilities while he awaits performance. *See* Sebert, *supra*, at 376–77 & n. 80.

Although the jury in the present case did not fix the exact duration of a commercially reasonable time, we assume that the jury determined market price at a time commercially reasonable under all the circumstances, in light of the absence of objection to the form of the special issue.

structions. The jury found that Helm did not repudiate its payment obligations for the second 04 delivery before Cosden cancelled order 04.[12] By finding that Cosden cancelled 04, the jury effectively found that the four orders comprised one contract, under which Helm was entitled to offset damages. *See* § 2.717. Any other view would have dictated the finding that Helm's attempt to offset constituted a breach or repudiation of its payment obligations under 04. In light of the stipulation that Cosden did not breach 04 before March 19, a few days after the due date, the jury effectively found that missing the payment date did not constitute a breach or repudiation by Helm.

This interpretation is also consistent with the jury's answer to another issue, which was given along with the text of (a) and (b) of section 2.609. The jury found that Cosden did not request adequate assurance of payment from Helm after Helm failed to make payments that were due under order 04. Thus, the jury could have found that Helm's failure to pay substantially impaired the value of that order to Cosden to the extent that it created reasonable grounds for insecurity with respect to Helm's performance. Without requesting adequate assurance from Helm, however, Cosden was not entitled to suspend its deliveries under 04. *See* § 2.609; *Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346, 354 n. 4 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.). The record shows that Cosden did not regard Helm's failure to pay when due as significant or alarming. *See Laredo*

*Hides Co. v. H & H Meat Products Co.*, 513 S.W.2d 210, 217, 220 (Tex.Civ.App.— Corpus Christi 1974, writ ref'd n.r.e.). Indeed, Cosden manifested a willingness to proceed with a substitute styrene monomer transaction, negotiating with Helm for up to a week and a half after the middle of March.

Since the four orders were components of one contract, Helm was entitled to withhold payment under section 2.717. The record contains evidence that Helm notified Cosden of the reason for withholding payment. The jury's finding of substantial impairment had no legal effect, and the district court properly disregarded it.

## IV. THE FORCE MAJEURE PROVISION

■ Cosden claims that the district court erred by failing to submit to the jury the question whether the force majeure provision on the reverse of Cosden's invoices became part of the Cosden-Helm agreement. Since the requested special issue did not cover a material factual issue, the district court did not err by declining to submit the issue. *See Simien v. S.S. Kresge Co.*, 566 F.2d 551, 555 (5th Cir.1978).

Cosden appears to argue that, since it had informed Helm that all sales were conditioned upon acceptance of terms printed on the reverse of the invoice, signed purchase confirmations 04 and 05 did not constitute an acceptance under section 2–207(a). Cosden then argues that Helm ac-

12. The jury made this finding in light of the following instructions, which we paraphrase:
 1. Cosden argued that it had performed in compliance with 04 until Helm breached or repudiated its payment obligations, which entitled Cosden to suspend deliveries.
 2. Helm argued that Cosden cancelled 04 before Helm breached or repudiated.
 3. Cosden and Helm stipulated that Cosden was not in breach prior to March 19.
 4. Cancellation occurs when either party puts an end to the contract.
 5. The buyer may set off alleged damages under a contract against amounts owed by the buyer under that contract provided the buyer gives notice of his intention to deduct all or part of the amount due.
 6. A buyer may not set off alleged damages under one contract against amounts owed by the buyer under another contract with the same seller. If the buyer attempts to do so his actions constitute a breach or repudiation of his obligations under the contract.
 7. Whether the four purchase orders represent one contract or more than one contract is to be determined from all the circumstances found from the evidence.
 8. If a buyer sets off alleged damages under one contract against amounts owed to the same seller under another contract, the seller can justifiably withhold any further delivery of goods.

cepted Cosden's "counter-offer" by failing to object to the terms and by making payment on the first polystyrene delivery. Cosden misplaces reliance on *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505 (7th Cir.1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969). In that factually dissimilar case, the parties exchanged forms and letters with varying terms during the negotiation process, prior to the commencement of performance.[13]

Cosden insists that it informed Helm during the negotiation process that sales were conditioned upon acceptance of its invoice terms. The record indicates, however, that Smith spoke at the meeting only in generalities, perhaps referring to Cosden's "normal" terms without discussing particular invoice terms. Smith specifically referred only to payment terms. After obtaining credit approval Smith signed and returned Helm's purchase confirmation, which contained all essential terms of the contract, including payment, without expressly stating that Cosden's acceptance was conditional upon Helm's assent to other terms. Smith testified that he was not aware that Scholtyssek had any opportunity to see the terms and conditions of sale prior to the first shipment and receipt of the invoice.

Section 2.207(a) "was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir.1972). Cosden expressed no such intent when it returned the signed purchase confirmation or shipped the initial amount of polystyrene. Smith's signature on the purchase confirmations operated as an acceptance under section 2.207(a). *See Luria Brothers & Co. v. Pielet Brothers Scrap Iron & Metal, Inc.*, 600 F.2d 103, 113 (7th Cir.1979); *Dorton*, 453 F.2d at 1168–69.

Cosden next argues that the invoice terms could have become part of the contract as additional terms under section 2.207(b). The district court was on firm ground when it effectively ruled as a matter of law that the force majeure provision could not have modified the Cosden-Helm contract. The Texas Supreme Court has held that "the process of acceptance and confirmation to which section 2.207 is addressed stops short of a monthly statement sent after the goods have been shipped. Consequently, the mere failure to object within a reasonable time, without more, would not ... establish an agreement." *Preston Farm & Ranch Supply Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 299–300 (Tex.1981).[14] *See Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443 (Tex.1982).

The district court did not err by declining to submit to the jury the question whether

**13.** In *Construction Aggregates*, CAC, which was constructing dikes, subcontracted to H–R responsibility for designing and furnishing a conveyor system. Responding to CAC's letter setting forth the "final agreement," H–R informed CAC that the order would not be accepted until H–R's corporate officers approved all conditions. H–R then returned the executed purchase order, but stated in a letter that acceptance was conditioned on modifications, including a substitute warranty clause. The court regarded the letter as saying, in effect, "I don't accept unless you agree to my changes." *Construction Aggregates*, 404 F.2d at 509 n. 3. CAC responded by requesting a change in payment terms, but did not object to the other modifications. H–R then accepted CAC's changes in a letter that also referred to H–R's earlier modifications. CAC made no objections. Under this set of facts, it was proper to treat H–R's letter accompanying the executed purchase order as a counter-offer and CAC's failure to object as an acceptance of H–R's modifications.

**14.** In *Preston Farm*, the court found that the parties reached an agreement, by conduct and over a long course of dealing, regarding the payment of service charges on stock-feed sales. The seller made over 20 separate sales over more than a year. Each month the seller received a statement containing the service charge provision. Many statements expressly stated that service charges had been imposed. The buyer continued to make purchases and paid the service charges without objection. At trial buyer testified that he had agreed to payment of the service charges until, after some time, he discovered that the interest charged was excessive.

Cosden's invoice terms, sent after the first shipment of goods, became part of the contract by virtue of Helm's failure to object. As a matter of law the invoice terms did not modify the contract under section 2.207. Moreover, under the evidence, a reasonable man could not determine that the conduct or course of dealing of the parties manifested an agreement to incorporate the invoice terms.

## V. TRADE USAGE

The district court submitted to the jury the special issue of whether, during the relevant period, a custom or trade usage relating to force majeure existed in the polystyrene industry whereby Cosden would be excused from delivering polystyrene to Helm. The jury answered in the affirmative with respect to general purpose polystyrene. Cosden argues that this finding frees it from liability for the undelivered amounts of polystyrene under orders 05 and 07. We disagree.

For the time in question, Cosden had planned to produce general purpose solely at its Windsor plant. The problems that Cosden experienced at Windsor stemmed from a newly-installed, defective reactor. There is no evidence, however, that established a trade usage under which polystyrene producers would be excused from making deliveries if defects surfaced in their production equipment. Evidence was introduced at trial to show that sellers and producers of polystyrene included force majeure provisions in various documents. But merely showing that polystyrene merchants attempted to include such provisions within contractual terms is insufficient to excuse Cosden's failure to perform orders 05 and 07.

 The Code employs "trade usage" to clarify or amplify the contracting parties intent in light of regular or established practices in an industry or location. *See* § 1.205 and comment 4. Employing "trade usage" aids in discerning the commercial sense or intent of an agreement and helps place parties' expectations in a relevant context. Without a more substantial evidentiary basis, however, trade usage cannot be used to add a term to the parties' contract in this case. *See Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346, 355 (Tex. Civ.App.—Amarillo 1976, writ ref'd n.r.e.).

## VI. "COVER" AS A CEILING

 At trial Cosden argued that Helm's purchases of polystyrene from other sources in early February constituted cover. Helm argued that those purchases were not intended to substitute for polystyrene sales cancelled by Cosden. Helm, however, contended that it did cover by purchasing large amounts of high impact polystyrene from other sources late in February and around the first of March. Cosden claimed that these purchases were not made reasonably and that they should not qualify as cover. The jury found that none of Helm's purchases of polystyrene from other sources were cover purchases.

Now Cosden argues that the prices of polystyrene for the purchases that Helm claimed were cover should act as a ceiling for fixing market price under section 2.713. We refuse to accept this novel argument. Although a buyer who has truly covered may not be allowed to seek higher damages under section 2.713 than he is granted by section 2.712, *see* § 2.713 comment 5; J. White & R. Summers, *supra*, § 6–4 at 233–34, in this case the jury found that Helm did not cover. We cannot isolate a reason to explain the jury's finding: it might have concluded that Helm would have made the purchases regardless of Cosden's nonperformance or that the transactions did not qualify as cover for other reasons. Because of the jury's finding, we cannot use those other transactions to determine Helm's damages.

## VII. REFRESHING RECOLLECTION

 While Gordian was testifying at trial, counsel for Cosden became aware of some notes at the witness stand. Gordian admitted that he had used the notes, along with a summary of his deposition, to refresh his recollection while preparing to testify. Cosden claims that the district court erroneously withheld access to the documents, under Rule 612, Fed.R.Evid.,

thereby denying Cosden the opportunity to inspect the writings and to cross-examine based on the writings.[15]

Cosden suggests that the district court was not aware of occasions when Gordian referred to the notes. The judge, however, agreed with Gordian, who testified that he had not looked at the notes. The trial judge stated that she had observed Gordian throughout his testimony without seeing him refer to the notes at any time. Because Gordian used the summary and notes to refresh his recollection prior to testifying, it was within the trial court's discretion to allow Cosden access to the writings. The court determined that the interests of justice did not require production of the writings for purposes of inspection or cross examination. We find no error in the trial court's decision.

## VIII. HELM'S CROSS APPEAL

### A. Reasonable Allocation

On cross appeal,[16] Helm contends that the district court erred by limiting damages under orders 05 and 07 to amounts of polystyrene that Cosden should have allocated to Helm. Instead, Helm argues that it should receive market-contract damages for all the general purpose polystyrene that Cosden contracted to deliver under 05 and 07. We agree.

The jury found that Cosden was excused under section 2.615(1) from delivering general purpose polystyrene (orders 05 and 07) due to the failure of presupposed conditions.[17] *See generally Robberson Steel, Inc. v. J.D. Abrams, Inc.*, 582 S.W.2d 558 (Tex.Civ.App.—El Paso 1979, no writ). Any impracticability caused by the failure of presupposed conditions only affected part of Cosden's ability to perform. Therefore, Cosden was required to allocate its product in a fair and reasonable manner. *See* § 2.615(2) & comment 11; *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 151 & n. 38 (6th Cir.1983). The jury, however, found that Cosden did not make a fair and reasonable allocation under the

---

15. Rule 612 provides in part:
 [I]f a witness uses a writing to refresh his memory for the purpose of testifying, either—
 (1) while testifying, or
 (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,
 an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.

16. We deny Cosden's motion to dismiss Helm's cross appeal, which was carried with the case. After the district court issued an order in response to motions for judgment, Cosden moved the court to clarify its order. The court then entered judgment, after which the parties timely filed their notices of appeal and cross appeal. Several days later the court denied Cosden's motion to clarify, after which Cosden again filed notice of appeal. Cosden claims that Rule 4(a)(4), Fed.R.App.P., rendered Helm's notice of appeal ineffective because it was filed prior to the district court's denial of Cosden's motion to clarify and Helm did not thereafter timely file notice of cross appeal.
 Helm was not required to file another notice of appeal. Rule 4(a)(4) applies only to four types of motions, each of which calls into question the correctness of the district court's decision. We refuse to rewrite the rule to encompass motions to clarify orders that precede judgment.

17. Section 2.615 provides:
 Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
 (1) Delay in delivery or non-delivery in whole or in part by a seller who complies with Subdivisions (2) and (3) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
 (2) Where the causes mentioned in Subdivision (1) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.
 (3) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under Subdivision (2), of the estimated quota thus made available for the buyer.

circumstances. By failing to allocate, fairly and reasonably, general purpose polystyrene to Helm, Cosden lost its ability to invoke the benefits of section 2.615(1). *See* J. White & R. Summers, *supra*, § 3–9 at 134; Wallach, *The Excuse Defense in the Law of Contracts: Judicial Frustration of the U.C.C. Attempt to Liberalize the Law of Commercial Impracticability*, 55 Notre Dame Law. 203, 224–25 (1979); Note, *Uniform Commercial Code § 2–615(b); Duty to Allocate in a Shortage Economy*, 14 Suffolk U.L.Rev. 1136, 1146–48 (1980). The district court erred by requiring the jury to determine the amount of polystyrene that Cosden should have allocated and by not granting Helm damages for the entire amount of general purpose due under orders 05 and 07. The record shows that Cosden sold general purpose polystyrene to other customers during the period in dispute and that, despite the difficulties that Cosden was experiencing, it had inventory and the production capability with which it could have provided Helm with an allocation of polystyrene.

We decline to accept Cosden's argument that its liability for undelivered polystyrene should not extend beyond the quantity that it should have fairly and reasonably allocated. Otherwise, sellers whose partial performance has been rendered impracticable would have no incentive to treat all of its customers equitably. Were we to adopt Cosden's suggested rule, a seller encountering unexpected problems could favor certain buyers at the expense of other customers, confident that any liability it incurred would be limited by the reasonable amount it should have allocated.

### B. Prejudgment Interest

■ Helm asserts on cross-appeal that the trial court erred by failing to award prejudgment interest under article 5069–1.03, Tex.Rev.Civ.Stat.Ann. (Vernon Supp. 1984). We disagree. Helm is not entitled to recover prejudgment interest because the amount of its damages was not definitely determinable prior to judgment. *Exxon Corp. v. Middleton*, 613 S.W.2d 240,

252 (Tex.1981) (uncertain standard for measuring market value).

The cause is remanded to the district court to modify Helm's damages under orders 05 and 07 and to decide the matter of appellate attorneys' fees.

AFFIRMED, but, in part, REVERSED and REMANDED.